## L. J. Sigur *v.* W. H. Crenshaw.

The Constitution of 1845 was superseded and not amended by the Constitution of 1852. (Slidell, C. J.)

The Article 144 of the Constitution of 1852 was framed in order to prevent the *interregnum* that would otherwise occur from the displacement of the old government and the organization of the new. (Slidell, C. J.)

It was not intended by the Constitution of 1852 that the old incumbents of office were to hold until the expiration of their respective terms, but only until their successors were appointed. (Slidell, C. J.)

When the people in the exercise of their sovereignty, deliberately put an end to the existing constitution, and adopt an entirely new one in its stead—all powers of government under the old constitution, necessarily cease, except in so far as they are maintained in existence by the new constitution. No one has such a vested right to office as to resist the necessary consequence of an entire abrogation, by the people, of the constitution, under the authority of which he holds it. Rights to property and the obligation of contracts stand on a different footing, and I do not understand art. 143 of the constitution as applicable to the right to an office. (Ogden, J.)

The Constitution of 1852 was intended as an abrogation of the constitution of 1845—and not merely as a change in some respects of an existing State government. (Ogden, J.)

Under the constitution of 1852 the Governor had the power, with the advice and consent of the Senate, to appoint a new Register of the Land Office, and on such appointment the right of the incumbent ceased. (Ogden, J.)

I feel bound to construe the two articles, 143 and 144 of the constitution of 1852, in such a manner as to give effect to both—if that be possible. The conclusion to which that rule of construction has led my mind is, that the appointing power of the government, organized under the constitution of 1852, is to be exercised with reference to pre-existing laws—and to rights acquired by individuals under pre-existing laws—in all cases where such laws and such rights are not inconsistent with the constitution itself. (Buchanan, J., dissenting.)

The sanctions of the law—the rights of persons were only disturbed by the constitution of 1852, in those cases and to that extent that the constitution contained declarations inconsistent with particular statutes and particular rights. (Buchanan, J., dissenting.)

The Register of the Land Office having been appointed to office under an Act of the Legislature which fixed the tenure " at two years, unle s removed in due course of law—and unless all said lands shall be sold before that time, when it shall be in the power of the Governor to discontinue the office "—and the limitation specified in the Act not having occured—the constitution of 1852 gave to the executive no authority to supersede him. (Buchanan, J., dissenting.)

APPEAL from the District Court, Sixth District, *Robertson*, J. *Sigur*, in pro. per. *Davidson & McHatton* and *J. M. & J. E. Elam*, for respondent and appellant.

*Sigur*—Brief for the relator and appellee.

The respondent and appellant, *W. H. Crenshaw*, was appointed Register of the Land Office at Baton Rouge on the 9th November, 1851, during the recess of the Senate, to fill the unexpired term of *Loucks*. This recess nomination was confirmed by the Senate on the 2d day of February, 1852. On the 14th of the same month and year, he was again nominated by the Governor and confirmed by the Senate, for the full term of two years.

He furnished the required bond and took the oath of office on the 16th day of March, 1852.

The relator, *L. J. Sigur*, was nominated by the present Governor of the State and confirmed by the Senate on the 31st day of March, 1853, Register of the Land Office at Baton Rouge, for two years, commencing on the 31st of March, 1853, the date of his commission. He took the oath of office, required by article 90 of the Constitution of 1852, and furnished the legal bond and security on the 2d day of April, 1853.

*W. H. Crenshaw* having refused to vacate the office and to deliver the papers, books, charts, maps, &c., appertaining to it, to the relator, the latter sued out a mandamus to compel him to do so. From the judgment of the Court, making this mandamus peremptory, *Crenshaw* has appealed.

51

The facts, as stated above, are not disputed. The only question of any difficulty raised by the pleadings, the only one which I feel myself called upon to discuss is: "Had the term of office of *Crenshaw* expired when the Governor appointed *L. J. Sigur* to succeed him?" For if it had expired, then a case—an occasion—for the legitimate exercise of the appointing power, vested in the Executive by the Act of 1844, and by the new constitution, had occurred; and it was not only the right, but it became the duty of the Governor to fill the vacancy.

It is a universally admitted principle—a principle of the Constitutional common law of the land—that our State governments are founded in, and maintained by the will and authority of the people, by whom they have been established. The written charters or constitutions which embody that will, and have been sanctioned by that authority, are the basis, the immediate "*Rationes Essendi,*" to use a barbarous expression of scholastic philosophy, of these governments. They have no original life, no continuous vitality from any other source. The different departments into which they are divided—the Executive, Legislative and Judicial, and the acts and creations of these derive their existence and powers, their force and effect from, and are sustained, either mediately or immediately, directly or indirectly, by these constitutions which first called them into being, organized them, and set them in motion. In short, to use the language of the civil, instead of the political law, these governments are moral entities, bodies politic, great corporations—the archetypes of all corporations—formed by the people for certain purposes, having no being out of the charters by which they are created, and therefore incapable of surviving them. See Vattel, Preliminaries, sec. 1 and 2; Ib. B. 1, chap. 1, sec. 1; Angel and Ames, Introduction, p. 10, sec. 4.

It follows from these premises that as soon as the constitution of a State—the basis and sustaining power, the charter of incorporation of the moral entity called "government"—is abrogated, superseded, made void, the entire edifice reared upon it must tumble to the ground, the fictitious ideal being, once "incorporated" by it, must again dissolve into its original nothingness, and all the rights, powers and immunities with which it was vested, revert to the grantors. A state of anarchy ensues, laws have no force, actions and rights are paralized, officers no longer exist, the terms of all officers expire.

Such, or analogous, were the consequences of the dissolution of corporations at common law—consequences flowing from the very nature and character, from the very definition and conception of corporations. See Angel and Ames, chap. 22, sec. 6, p. 750. The uniform practice of all the Conventions which have from time to time assembled in the different States, from the earliest period of our national existence down to our day, to adopt a constitution or to remodel and recast the existing one, attests that in their opinion, at least, and as far as the effects of their dissolution is concerned, there is no difference between these great archetypes of all corporations—governments or States, for they are synonomous—and ordinary corporations. With one or two exceptions, which will · be explained in their proper places, the utmost care and industry were used by these Conventions to provide against the state of anarchy which, it was assumed and in most cases proclaimed, would ensue upon the supersession of the old constitution or form of government, and would continue until the new one was thoroughly organized. Temporary governments, under the significant head of "schedules," were established as receptacles of the powers, rights and duties of the sovereignty, until these powers, rights and duties could be definitely transferred to and exercised by the new corporation, and every necessary measure was prescribed to facilitate and even hasten the change. A rapid survey of the constitutions of the different States, or of such of their provisions as relate to this subject will show:

1.   The universal admission of the proposition contended for above.

2.   That the principle once adopted, its application must be general, and can admit of no exception.

3.   The language used will serve to throw light upon article 144 of our own constitution, upon which the decision of this case must turn.

The State of Maine was formed out of a district of Massachusetts. It became independent of that State in 1820, and adopted its constitution in the same year. The following provisions are to be found in the schedule of her constitution:

"4. All laws now in force in this State and not repugnant to this constitution, shall remain and be in force until altered or repealed by the Legislature, or shall expire by their own limitation."

"5. All officers provided for in the sixth section of an Act of the Commonwealth of Massachusetts, passed on the nineteenth day of June, in the year of our Lord one thousand eight hundred and nineteen, entitled an 'Act relating to the separation of the district of Maine from Massachusetts proper, and forming the same into a separate and independent State,' shall continue in office as therein provided, and the following provisions of said act, &c., &c."

The sixth section of the Act here referred to, provides that "all officers who shall on the said 15th day of March next (the day on which the separation was to take place,) hold .commissions or exercise any authority within said district of Maine, under the Commonwealth of Massachusetts or by virtue of the laws thereof, excepting only the Governor, Lieutenant Governor and Council, the members of the Legislature and Justices of the Supreme Judicial Court of the said Commonwealth of Massachusetts, shall continue to have and to hold, use, exercise and enjoy, all the powers and authority to them respectively granted or committed, until other persons shall be appointed in their stead or until their respective offices shall be annulled by the Government of the said proposed State."

The Constitution of New Hampshire, under the head of "Oath and subscription, exclusion from, &c. &c.," from similar views and for like objects, contains the following provisions:

"All laws which have heretofore been adopted, used and approved in the Colony, Province, or State of New Hampshire, and usually practised on in Courts of law, shall remain and be in full force until altered or repealed by the Legislature," &c.

"To the end that there may be no failure of justice or danger to the State, by the alteration and amendments made in this Constitution, the General Court is hereby fully authorized and directed to fix the time when the said alterations and amendments shall take effect and make the necessary arrangements accordingly."

The present Constitution of Vermont was adopted in 1793, and only amended in 1828. Her first constitution was framed in 1777. No provisions of the character of those already quoted from the constitutions of Maine and New Hampshire are to be found in the constitutions of Vermont as they are given to the public in the collection of "American Constitutions," and I have not been able to procure the statutes of that State to ascertain whether such provisions had been made, but were omitted in the collection referred to, as in other instances, on account of their temporary character. The political history of Vermont is, at any rate, rather eccentric. She continued to be governed by an unwritten constitution until one year after the declaration of independence.

The present constitution of Massachusetts was adopted in 1780; it has since received several amendments. It contains the following provisions:

Chap. vi. sec. 6. "All laws which have heretofore been adopted, used and approved in the Province, Colony, or State of Massachusetts Bay, and usually practiced on in the Courts of law, shall still remain and be in full force, until altered or repealed by the Legislature, such parts only excepted as are repugnant to the rights and liberties contained in this constitution.

Sec. 9. "To the end that there may be no failure of justice, or danger arise to the commonwealth from a change of the form of government, all officers, civil and military, holding commissions under the government and people of Massachusetts Bay, in New England, and all other officers of said government and people, at the time this constitution shall take effect, shall have, hold, use, exercise and enjoy all the powers and authority to them granted or committed, until other persons shall be appointed in their stead, and all Courts of law shall proceed in the execution of the business of their respective departments, and all the executive and legislative officers, bodies and powers, shall continue in full force, in the enjoyment and exercise of all their trusts, employments and authority until the General Court and the Supreme and Executive officers, under this constitution, are so designated and invested with their respective trusts, powers and authority."

The Constitution of Rhode Island provides, art. xiv., sec. 1, that "All civil and military officers now elected, or who shall hereafter be elected by the General Assembly, or other competent authority, before the said first Wednesday

of April, shall hold their offices and may exercise their powers until the said first Wednesday of May, or until their successors shall be qualified to act. All statutes, public and private, not repugnant to this constitution, shall continue in force until they expire by their own limitation, or are repealed by the General Assembly. All charters, contracts, actions and rights of action, shall be as valid as if this constitution had not been made. The present government shall exercise all the powers with which it is now clothed until the said first Tuesday of May, 1843, until the government, under this constitution, is duly organized."

The Constitution of Connecticut, article x, 3, provides that "The rights and duties of all corporations shall remain as if this constitution had not been adopted, with the exception of such regulations and restrictions as are contained in this constitution. All judicial and civil officers, now in office, who have been appointed by the General Assembly and commissioned according to law, and all such officers as shall be appointed by the said Assembly, and commissioned as aforesaid, before the first Wednesday of May next, shall continue to hold their offices until the first day of June next, unless they shall, before that time, resign or be removed from office, according to law. The Treasurer and Secretary shall continue in office until a Treasurer and Secretary shall be appointed under this constitution, All military officers shall continue to hold and exercise their respective offices until they shall resign or be removed, according to law. All laws, not contrary to or inconsistent with the provisions of this constitution, shall remain in force until they shall expire by their own limitation, or shall be altered, or repealed by the General Assembly, in pursuance of this constitution. The validity of all bonds, debts and contracts, as well of individuals as of bodies, corporations," &c. &c.

Similar provisions and arrangements, to facilitate the passage from the old to the new constitution, and to prevent an interregnum, may be found in article i, sec. 17, and article xiv, sec. 1, et seq. of the Constitution of New York.

The Constitution of New Jersey, article x, sec. 1 and 2, provides that "the common law and the statute law, now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitation or are altered or repealed by the Legislature, and all writs, actions, causes of said actions, prosecutions, contracts, claims, or rights of. individuals, and of bodies corporate and of the State, and all charters of incorporations, shall continue, and all in- dictments which shall have been found for any crime or offence committed before the adoption of this constitution, may be proceeded upon as if no change had taken place. The several Courts of law and equity, except as herein otherwise provided, shall continue with the like powers and jurisdictions as if this constitution had not been adopted.

2. "All officers now filling any office or appointment shall continue in the exercise of the duties thereof according to their respective commissions or appointments, unless by this constitution it is otherwise directed."

The following are the provisions of the constitution of Pennsylvania :

SCHEDULE.

"That no inconvenience may arise from the alterations and amendments in the constitution of this Commonwealth, and in order to carry the same into complete operation, it is hereby declared and ordained, that:

"1. All laws of this Commonwealth, in force at the time when the said alterations and amendments in the said constitution shall take effect, and not inconsistent therewith, and all rights, prosecutions, actions, claims, and contracts, as well of individuals as of bodies corporate, shall continue as if the said alterations and amendments had not been made.

"2. The appointing power shall remain as heretofore, and all officers in appointment of the executive department shall continue in the exercise of the duties of their respective offices until the Legislature shall pass such laws as may be required by the eighth section of the sixth article of the amended constitution, and until appointments shall be made under such laws; unless their commissions shall be superseded by new appointments, or shall sooner expire by their own limitations, or the said offices shall become vacant by death or resignation, and such laws shall be enacted by the first Legislature under the amended constitution."

The Constitution of Delaware contains the following provisions :

"Article vii.—Sec. 9.

" All the laws of this State, existing at the time of making this constitution, and not inconsistent with it, shall remain in full force, unless they shall be altered by future laws ; and all actions and prosecutions now pending, shall proceed as if this constitution had not been made.

"Schedule, 'Sec.' 10.

."The Acts of the General Assembly, increasing the number of Justices of the Peace, shall remain in full force until repealed by the General Assembly; and no office shall be vacated by the amendments to this constitution, unless the same be expressly vacated hereby, or vacating the same is necessary to give effect to the amendments."

I find the following provision in the constitution of Virginia of 1830. I have not been able to get a copy of the present constitution of that State, or of the ordinance by which the constitution of 1830 was organized. But the following, even though from a superseded constitution, will serve equally well to illustrate the principle, and support the conclusions which I am endeavoring to establish :

" Article vii.

"The Executive department of the government shall remain as at present organized, and the Governor and privy counsellors shall continue in office until a Governor, elected under this constitution, shall come into office ; and all other persons in office when this constitution shall be adopted, except as herein otherwise expressly directed, shall continue in office till their successors shall be appointed, or the law shall otherwise provide ; and all the Courts of justice now existing, shall continue with their present jurisdiction, until and except so far as the judicial system may or shall be hereafter otherwise organized by the Legislature."

No provisions of a similar character to those quoted above are to be found in the constitutions of North and South Carolina, the first adopted in 1775, the second in 1790, and continued to our day with only a few amendments. They were not necessary, as these constitutions were adopted by the Legislatures of those States, which could make the proper arrangements to carry them into effect. The Legislatures of these States still continue to possess the power of amending their respective constitutions. Const. of North Carolina, article iv, sec. 2. Const. of South Carolina, article xi.

The first constitution of Georgia was framed in 1777, the second in 1785, and the present one in 1798 ; it was amended in 1839. It contains the following provisions :

" 14. All civil officers shall continue in the exercise of the duties of their several offices, during the periods for which they were appointed, or until they shall be suspended by appointments made in conformity to this constitution ; and all laws now in force shall continue to operate, so far as they are compatible with this constitution, until repealed, and it shall be the duty of the General Assembly to pass all necessary laws and regulations for carrying this constitution into full effect."

The Constitution of Indiana provides :

Article iv.—Sec, 14.

"Sec. 1. That no evils or inconvenience may arise from the change of a territorial government to a permanent State government, it is declared by this constitution, that all rights, suits, actions, prosecutions, recognizances, contracts and claims, both as it respects individuals and bodies corporate, shall continue as if no change had taken place in this government,

" 2. All fines, penalties and forfeitures, due and owing to the territory of Indiana, or any county therein, shall inure to the use of the State or county. All bonds executed to the Governor, or any other officer, in his official capacity, in the territory, shall pass over to the Governor or other officers of the State or county, and their successors in office, for the use of the State or county, or by him or them to be respectively assigned over to the use of those concerned, as the case may be.

" 3. The Governor, Secretary, and Judges, and all other officers, civil and military, under the territorial government, shall continue in the exercise of the

duties of their respective departments, until the said officers are superseded under the authority of this constitution.

"4.   All laws and parts of laws, now in force in this territory, not inconsistent with this constitution, shall continue and remain in full force and effect, until they expire, or be repealed."

The Constitution of Wisconsin provides :

## "ARTICLE XIV.—*Schedule*.

"SEC. 1.   That no inconvenience may arise by reason of a change from a territorial to a permanent State government, it is declared that all rights, actions, prosecutions, judgments, claims and contracts, as well of individuals as of bodies corporate, shall continue as if no such change had taken place, and all process which may be issued under the authority of the territory of Wisconsin, previous to its admission into the Union of the United States, shall be as valid as if issued in the name of the State.

"2.   All laws now in force in the territory of Wisconsin, which are not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the Legislature.

"3.   All fines, penalties, or forfeitures accruing to the territory of Wisconsin, shall enure to the use of the State.

"5.   All officers, civil and military, now holding their offices under the authority of the United States, or of the territory of Wisconsin, shall continue to hold and exercise their respective offices until they shall be superseded by the authority of the State."

The Constitution of Iowa was adopted in 1846.   It contains the following provisions :

## "ARTICLE 12, *Schedule*.

"SEC. 1.   That no inconvenience may arise from a change of territorial government to a permanent State government, it is declared that all writs, actions, prosecutions, contracts, claims or rights, shall continue as if no change had taken place in this government, and all processes which may, before the organization of the judicial department under this constitution, be issued under the authority of the territory of Iowa, shall be valid as if issued in the name of the State.

"SEC. 2.   All laws now in force in this territory, which are not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the General Assembly of this State.

"SEC. 5.   All officers, civil and military, now holding offices and appointments in this territory, under the authority of the United States, or under the authority of this territory, shall continue to hold and execute their respective offices and appointments until superseded under this constitution.   See Code of Iowa."

The very same provisions may be found in the schedule of the constitution of Arkansas, with these slight differences, that in Sec. 5, which relates to the officers, the words "holding commissions" are used, instead of the words "holding offices and appointment," employed in the constitution of Iowa.   See Revised Statutes of Arkansas.

The provisions of the Constitution of Alabama are also similar, with the exception of the article continuing the officers in office.   It reads thus :

"SEC. 4.   All officers, civil and military, now holding commissions under the authority of the United States or of the territory of Alabama, within this State, shall continue to hold and exercise their respective offices, under the authority of this State, until they shall be superseded under the authority of this constitution, and shall receive from the treasury of this State the same compensation which they heretofore received, in proportion to the time they shall be so employed.   The Governor shall have power to fill vacancies by commissions to expire as soon as elections or appointments can be made to such offices, by authority of this constitution."   See Code of Alabama.

The same provisions, in the same words, are to be found in the constitution of Missouri.   The provision for the salary of the officers continued in office, is the same as in the constitution of Alabama.

The constitution of Ohio, of 1802, its first constitution contains, substantially, the same provisions.   The present constitution, adopted in 1852, repeats them.   The 5th Sec. however, is different, and deserves attention.   It is in these words :

"The Register and Receiver of the Land Office, Directors of the Penitentiary, Directors of the Benevolent Institutions of the State, the State Librarian and all other officers not otherwise provided for in this constitution, in office on the first day of September, 1851, (the day on which the constitution, if adopted, was to be proclaimed,) shall continue in office until their terms expire respectively, unless the General Assembly shall otherwise provide." See Statutes of Ohio.

The schedule of the present Constitution of Mississippi is very much the same as those of Alabama, Missouri, and Louisiana. The provision regarding the officers of the State runs thus :

"Sec. 3. The Governor and all officers, civil and military, now holding commissions under the authority of this State, shall continue to hold and exercise their respective offices until they shall be superseded, pursuant to the provisions of their constitution, and until their successors are duly qualified." See Laws of Mississippi.

The schedule of the Constitution of Tennessee, adopted in 1834, besides the usual provisions relative to the laws, contains the following :   "That no inconvenience may arise from a change of the constitution, it is declared, that all officers, civil and military, shall continue to hold their offices, and all the functions appertaining to the same shall be exercised and performed according to the existing laws and constitution, until the end of the first session of the General Assembly which shall sit under this constitution, and until the government can be organized in such manner as the first General Assembly shall prescribe and no longer."

The schedule of the Constitution of Kentucky is substantially the same as the above, with the exception of the fifth section, which is explicit and deserves to be cited :

"That all officers now filling any office or appointment shall continue in the exercise of the duties of their respective offices or appointments, for the terms therein expressed, unless by this constitution it is otherwise directed."

The schedule of the constitution of Texas contains the usual provisions concerning the laws. The section which continues the officers in office is in these words :

Sec. 10. That no inconvenience may result from the change of Government, it is declared that the laws of this Republic relative to the duties of the officers, both civil and military of the same, shall remain in full force, and the duties of their several offices shall be performed according to existing laws, until the organization of the Government of the State under this Constitution, or until the first day of the meeting of the Legislature ; that then the offices of President, Vice-President, of the President's Cabinet, Foreign Ministers, Charges and Agents and others, repugnant to this Constitution, shall be superseded by the same, and that all others shall be holden and exercised until they expire by their own limitation or be superseded by the authority of this Constitution or laws made in pursuance thereof."

The schedule of the Constitution of Florida is like that of the Constitution of Alabama. See Thompson's Digest Laws of Florida.

The provisions of the schedule of the Constitution of California, with regard to officers, is pretty much, if my memory serves me, the same as that of the Constitution of Louisiana.

Besides the provisions quoted above, these Constitutions contain other and more minute arrangements to facilitate the organization of the new Government, such as the transfer of the records, suits, &c., from the old to the new Courts.

I have placed the Constitutions of the different States under the eyes of the Court, to show the universal understanding that the adoption of a new form of Government or Constitution supersedes, avoids, displaces, destroys the old in every and in all its parts ; that the laws in force under that superseded Constitution, if continued in effect, derive their validity from the new Constitution which continued them, and not from the old, under which they originated ; that the officers of the old Government are functi officio, and if continued in office by a provision of the new organic law, they hold under that provision and not under their first appointment. For what would be the object of these provisions, why the fear of the "inconveniences" so carefully guarded against, if these laws, enacted by the former Government, retained their force, and the appointments made, continued valid ? The principle acted upon by these conventions has many analogies in other systems of law. For instance, the King of

England is a corporation sole. He is the fountain of patronage and of honor. Therefore at his death all offices become vacant. An act was passed in the sixth year of Queen Anne, " to remedy the inconvenience," but this act applied only to certain offices and not to the judges. Accordingly it was held that their offices were determined on the demise of the King, although the act of the thirteenth year of William III had provided that their commissions would be " quamdiu bene sese gesserint." Further to secure their independence it was enacted in the first year of George III, that the demise of the King should no longer have that effect.

Another object which I have had in view has been to show practically the distinction carefully preserved between the law creating the offices, prescribing the duties and defining their terms, and the officers filling those offices. For the laws creating the offices are not only continued, but distinct provisions are made continuing the then acting officers, in most of the Constitutions, until they are superseded under the new organization, and in two or three instances for the full term of their original appointments. But in these latter cases the most explicit and unequivocal language is used, such as " shall continue according to their respective commissions or appointments," or "until their commissions expire," or "for the term for which they have been appointed." All officers, without any distinction, whether of Legislative or Constitutional creation, whether elective or appointed by the Executive, are included in these provisions. The general principle which made it necessary to continue one class of officers applied equally to all the others. The most petty officer, as well as the most significant and important, must have fallen with the Government of which he was a part; he could not claim to exercise his duties under the new Government, because he was not of it, had not received his appointment from it, did not qualify under it, and for aught that can be known, did not possess the qualifications required by it.

And this leads me to the main object of these references, namely, to show the character, objects and purposes of these provisions or schedules. "The representatives of the people of Louisiana," says Judge Matthews, in the case of *Bermudez* v. *Ibanez*, Martin's Rep. O. S. p. 3, " met for the purpose of laying the foundation of a State Government, the establishing a permanent Constitution, and the providing for a temporary · Government. As in Representative Governments considerable time is necessary to effect a change, it becomes necessary, in order to avoid anarchy, to create a kind of intermediate Government, the duration of which expires when the permanent Government is organized and goes into operation. These two governments are distinct and separate ; they are to succeed the one to the other ; they cannot be blended in whole or in part.

" This being understood, it is next to be considered how the judiciary power of that temporary government was regulated by the schedule.

" The Convention, desirous of avoiding the inconvenience which might arise from a change of Government, declared " That the Governor, Secretary, Judges, and all other officers under the Territorial Government should continue in the exercise of the duties of their respective departments until they should be superseded under the authority of the Constitution.

" The intention of the Convention, clearly manifested by the expression of the schedule, was for the time to maintain the order of things which existed *until then*, as if no change has existed."

And in the case of *Massicot* v. *Dufau, ibid*, p. 291, the same Judge says: " It has already been said in *Bermudez* v. *Ibanez*, that the permanent Government to be established under our Constitution, and the temporary administration provided for by the schedule annexed to that Constitution were separate and unconnected. All the provisions of the Constitution were applicable to the Government to be organized under it, none of them to the temporary Government. The express object of the schedule was to maintain the order of things then existing, as if no change had taken place, until the permanent Government could be organized. This organization was not the work of a day, as some persons may have fancied. It was to take place by degrees ; the Legislature was first created ; then the Executive ; then the Judiciary. In each branch of the Government the Constitution could not go into operation before the late authorities were superseded by those of new creation. Any other construction of the Constitution and schedule would make their dispositions contradictory and

confused." The most cursory examination of the schedules of the different Constitutions will show that their character and purposes are such as *Judge Matthews* defines them—temporary Governments, having a separate and distinct existence from the new and the old—intended to serve a temporary purpose—and nothing more. Nor is there any distinction made, as indeed there is no legal difference between cases of changes from the territorial State to the condition of State sovereignty, and changes from one form of State sovereignty to another form of State sovereignty. In the first, as in the latter case, one Government is distinct and separate from the other—it is a different entity. The Government of the State of Louisiana, under the Constitution of 1852, is as distinct and different, according to the principles of legal science, from the Government of 1845, as that Government was distinct and different from the territorial Government. This Court could not entertain suits commenced before its predecessors, or appeals from the inferior Courts of the Constitution of 1845 —these very inferior Courts themselves, under the present Constitution, could not try suits commenced before their predecessors, of the Constitution of 1845 —were it not for the law of the Legislature, enacted in pursuance of Article 146 of the present Constitution. The officers of the Constitution of 1845 are not the officers of the Constitution of 1852, and as long as the former continue in office, the present Government will remain *pro tanto* unorganized. *Governor Walker* succeeded *Governor Johnson*; the acts of the former were the acts of the latter in the contemplation of law. But the present Governor of the State did not succeed to *Governor Walker;* he was the creature of a distinct and different creator; the acts of the former did not bind the latter, he received nothing from him, he had nothing to yield. He exercises his constitutional rights in their entirety.

Arguing from these principles, which are assumed by the Constitutions I have reviewed, is not the conclusion irresistible, unless contradicted by the most positive and explicit language, that these temporary "officers" are only tenants at will, to be removed as soon as the particular department under whose control they fall, is ready to exercise its constitutional functions? Is it not obvious that to continue them longer, would be to continue the disorganization of the Government, or at least to prolong, without cause, the temporary Government? That such could not have been the desire of the framers of our Constitution, is apparent from the care which they took to provide for that organization in all the departments of the Government, and especially in the Executive. That Constitution contains a provision which is not to be found in other Constitutions, and which, in strictness, would not be necessary to enable the Governor to exercise the appointing power in this and similar cases. But its presence, especially in the schedule, can be explained only on the ground that the convention desired and directed that he should exercise the powers conferred upon him, to organize his department; as they had directed the Legislature to organize the other branches of the Government. See Article 145, Constitution of 1852. That Constitution, Article 90, requires that "members of the General Assembly and all officers, before they enter upon the duties of their offices, shall take the following oath or affirmation : " I do solemnly swear or affirm that I will support the Constitution of the United States, and of this State." What Constitution? Clearly, the present Constitution. Is the respondent an officer of this State? Are all the officers who still hold over under the schedule? Certainly not; they are officers of the " State " or Government of 1845, not of the State or Government of 1852 ; and as long as they continue under their original appointment they are not " qualified officers " of the present Government, they are an anomaly in it, living antinomies, staring the plain text of the Constitution in the face.

Assuming then the principle to be established beyond reasonable ground of controversy, that but for the saving clauses of the schedule annexed to the Constitution, all laws passed under the superseded Constitution, as well as all offices created and all officers appointed under it, would have fallen with it ; let us proceed to examine to what extent these saving clauses continue the pre-existing state of things.

It is extraordinary that any doubt should be created as to the proper interpretation to be given to the Article of the Constitution in which these saving clauses are found. Language more simple and intelligible could scarcely have been framed to give expression to the dominant idea of that Article.

52

Sigur
v.
Crenshaw.

"In order that no *inconvenience* may result to the public service from the taking effect of this Constitution, no office shall be superseded thereby; but the laws of the State relative to the duties of the several offices, Executive, Judicial and Military, shall remain in full force, though the same be contrary to this Constitution, and the usual duties shall be performed by the respective officers of the State, according to existing laws, until the organization of the Government under this Constitution, and the entering into office of the new officers to be appointed under said Government, and *no longer.*" Art. 144.

The convenience of the public service is here plainly set forth as the controlling motive for the temporary continuance in office of all officers appointed under the prior Government. Now the inconvenience which would have resulted to the public service from the omission of such a clause is too obvious to require comment. The Constitution did not appoint a Governor, nor did it elect a Legislature or nominate Judges. It simply provided the means for their creation. It was absolutely necessary, therefore, that until this machinery of the new Government could be set in actual motion, the old officers should continue in the exercise of their functions, *but no longer.* As soon as the Executive or appointing power was placed in a condition to act, and to supersede by new appointments the incumbents who held under the former government, the convenience of the public service no longer required the continuance of these latter in office. Then the temporary consideration which had prolonged their existence beyond the life of the power which created them, having been answered, they naturally followed the fate of that power to which they owed their being.

This view of the meaning of Article 144, derived from the consideration of the motive which is spread upon its face, is amply confirmed by an examination of the details of the Article.

Provision is made first for the *offices* that they shall not be superseded. Secondly, for the *duties* of those offices, that they shall in no wise be modified, abridged or altered, even though contrary to the Constitution; and thirdly, for the officers themselves, that their offices shall be filled, and their duties performed by the existing officers of the State *until* (observe the adverb of limitation) the organization of the new Government, and the *entering into office of the new officers* to be appointed under said Government, and *no longer.*

Then the old officers were to continue in office, notwithstanding the adoption of the new Constitution. But how long? The Constitution itself answers the question—*until* the organization of the new Government, and the entering into office of the new officers, and *no longer.* This then is the real tenure of the old officers, to remain in office in order that no inconvenience should result to the public service, until their successors are appointed and enter upon the discharge of their duties.

In connection with this view, the attention of the Court is particularly called to the closing phrase of the article, "and no longer." Why are these words of limitation inserted? If, as is contended for by the respondent, the old incumbents were entitled, under the Article, to hold until the expiration of their respective terms of office, then the power to appoint in their stead would not exist under the new Constitution until their terms had actually expired. In that view it was more than idle to say, they were to hold until the new officers should enter, and *no longer,* because no doubt could possibly arise but that they could properly be ousted at the expiration of their terms, by new appointments, and the declaration that they should not hold for a longer period than their term warranted, is meaningless.

But the framers of the Constitution had an intention and a meaning in the insertion of these limitative words, one too directly applicable to the case before the Court. An officer appointed under the old Government might insist, when a successor was appointed to him under the new, that he had a right still to hold, as his term had not expired. And for him asserting such a claim, was the closing phrase of the Article designed, declaring he should continue to hold only until his successor was appointed, and no longer. That is, that he should not be allowed to justify his refusal to surrender the office to the new appointee, upon the pretext that he had a *longer* time to serve.

But it is said that the officers spoken of and designated in the Article 144 are, as termed by the respondent, constitutional officers, that is, such officers as are especially mentioned in the body of the limitation itself, and that it is to them only the limitation to hold until their successors are appointed, applies.

If this were true, then, as the clause referred to is the only one retaining the officers after the extinction of the Constitution under which they were appointed, the right to hold office of all those officers which are not included in the designation, would have ceased to exist by the adoption of the new Constitution and the superseding of the old.

But there is, in truth, no warrant to be found for this interpretation. The terms used in this Article are general; they apply as well to constitutional officers as to all others: "the several officers, Executive, Judicial and Military," are terms which comprise every office within the limits of the State. They are the technical words used in most of the Constitutions of our sister States, as being the most apt and proper to include, by the largest expression, every person exercising authority under the organic law.

Thus the Constitution of Vermont, chap. 2, art. 29, provides that "Every officer, whether judicial, executive or military,. in authority under this State, before he enters, &c., shall take and subscribe,' &c., &c." Similar provisions are to be found in the Constitutions of Maine, Connecticut, New York, Alabama, Mississippi, Kentucky and Michigan.

It so happens, also, that there are no constitutional officers, that is, no officers mentioned in the Constitution and embraced under the terms "military;" for the Constitution no where speaks of any military officer. To sustain their views, therefore, the counsel of the respondent are compelled, contrary to every sound canon of interpretation, to give to general words a limited and qualified signification, when nothing in the context calls for the limitation, and besides, in adopting such an interpretation, and limiting the words "officers, Executive, Judicial and Military," to constitutional officers, they are obliged to exclude a portion of the very officers named in the Article, to wit: military officers who are not constitutional officers.

Were it necessary to say more in reply to this view, a reference to the term used in the Article with regard to officers there spoken of, would suffice to show that the framers of the Constitution were providing for *other* than constitutional officers. The expression referred to is "the new officers to be *appointed* under said Government."

All the constitutional officers are *elected* by the people. Had they solely been included in the Article, the phrase used would obviously have been "the new officers to be *elected* under the said Government;" but as in reality all officers, constitutional and others, were embraced in the provision, the larger expression, "appointed," was of necessity adopted.

The counsel for the respondent say, "If the statute, (the Act of 1844,) is in full force, and *Crenshaw* was duly appointed under, you cannot remove him without further legislation. The effort to distinguish between the office and the officer created by this Act must fall. The Act exists, office and officer, as a whole." I have shown that the terms of office of *Crenshaw* and of other officers, existing at a certain time, had been curtailed by legislation, i. e., the enactment of a new Constitution, subsequent to his appointment. In this respect he does not stand alone—the terms of other important officers were curtailed by the same Constitution, and that without affecting, in the least, the existence of the laws which created their offices and defined the duties of them. The proposition that the statute of 1844 exists as a whole, office and officer, and that the office must cease to exist and the law which creates it become a nullity, if the term of any particular incumbent is curtailed, is preposterous. It is only the expression of a very common whim and fancy of public officers, of long standing in office, who gradually persuade themselves that their services cannot be dispensed with : but it has not the slightest foundation either in law or common sense. *Mr. Crenshaw* might die in office or be removed by address, before the expiration of his term. Would this change, in the least tittle, the law of 1844? The Legislature might have passed an act saying in so many words, "the present Register of the Land Office shall continue in office until the month of May, 1853, and no longer;" or, in more general terms, "the present officers of the State shall continue in office until the month of May, 1853, and no longer." Would this have been held to amount to a repeal of the laws creating their offices, or even a change of the terms fixed by those laws? Surely not! As special provisions, they would operate upon a special set of officers, and not upon their successors. Special provisions do not repeal general ones ; for instance, the term of the first Governor, under the Constitution of 1852, is only

three years, whilst the term of his successors will be four, and so of the terms of many of the present officers of the State. Does this special disposition, with regard to the first officers elected under this Constitution, interfere with, repeal or set at naught the general provision fixing the term of those officers? Where is the repugnancy?

The very Article 144, which the counsel has labored to twist and transform to suit his case, makes the distinction which the counsel denies as broadly as it can be drawn. "No office shall be superseded," no office shall lapse by the fact of the adoption of the Constitution. Every law creating certain public functions, regulating the mode and manner of their discharge—which constitutes *the office*—shall remain in force; but the then *officers* shall continue to discharge those functions, only until the organization of the new Government.

The counsel asks, "if it is not most clear that Article 144 applies only to those new officers who would have held, in opposition to the elective principle established by the new Constitution?" If the last clause of that Article was intended to apply only to such officers, why was not the distinction made? Why were the most general and comprehensive terms used? That the Constitution did assume the principle that it was necessary to establish a temporary Government to avoid anarchy, until the new could be organized—that they, as well as other Conventions, thought it necessary, in the establishment of this temporary government, to provide *officers*, as well as laws—cannot be denied. But where is the provision to be found for the officers excluded—for they, too, are necessary to carry on this temporary government—if the distinction contended for by the counsel is well founded? Have other Conventions, guided by the same general principles—for each art or science has its peculiar principles, rules and modes of action—admitted the distinction? They only differ in this, that in two or three instances a particular class of officers of the temporary Government is *continued* in office for a longer term than another; but the provision *to establish* these temporary officers is general, including every class and description of officers. In the Constitution of our State, the same officers that are *established* are *continued*, and in the same sentence and connection. To make a distinction between one class of officers and another, would be to charge the Convention with the grossest inconsistency, and to suppose that they could, with the same stroke of the pen, admit a general evil and provide but a partial remedy.

I am at a loss to discover the bearing of the cases of *Bry* v. *Woodruff*, 3 L. R. 557 and *Kelly* v. *Gilley*, 5 Ann. 584, upon the present controversy. The office of President of the Board of Public Works was held by the Supreme Court, in the first case, to be a periodical office, that is to say, an office, the term of which was to commence and expire at certain fixed points of time—fixed either absolutely or relatively. The law creating the office is in these words: "The Governor, as soon as may be after the passage of this act, and EVERY TWO YEARS thereafter, shall nominate and appoint, &c." Here the points of time at which the office is to commence and terminate is fixed by fixing the periods when the appointing power shall be exercised. In *Kelly* v. *Gilley*, the office of notary being then for a term of years, and not a periodical office, they held that appointments made in cases of vacancy should be for the full term of four years, and not for the unexpired portion of the term. The offices of Justices of the Supreme Court, Governor and others, are, by the present Constitution, made both offices for a term of years, and periodical offices; for their duration is limited and the points at which they commence and terminate are also fixed. But the office of Register, although an office for a term of years—for two years—is not a periodical office. There is not a single expression in the law creating it, there was no reasons of policy to induce the Legislature to make it a periodical office.

I beg leave to call the attention of the court particularly to the limit fixed by Article 144, to the tenure of the temporary officers provided by it. They hold "until the organization of the Government under this Constitution, and *the entering* into office of the new officers to be appointed under said government and no longer." The limit is "the organization of the Government under this Constitution." The phrase "and the entering, &c." is nothing but a modality, or qualification of that term, similar to and synonymous with the phrase "and until their successors are duly qualified," which is to be found in clauses fixing the terms of offices and which was intended in the present case to maintain the

officers in office during the intermediate time between the expiration of their terms, to wit: "The organization of the government," and the moment when the Governor could exercise the appointing power and his new appointees could qualify themselves, and be ready to "enter into office." The Convention did, in adopting this "modality" or "qualification" of the term which they had fixed, what they themselves required the Legislature to do, when they fix the terms of offices. See Art. 125, Const. 1852.

For the discussion of other topics which have been introduced in this case, I beg leave to refer this Court to the very full and learned opinion of the Judge *à quo.*

*Davidson & McHatton,* for respondent and appellant:

This brief is submitted to the honorable the Judges of the Supreme Court of the State of Louisiana, in the case of *L. J. Sigur,* for a mandamus against *Wm. H. Crenshaw,* Register of the Land Office, created for the State of Louisiana, by the act of the Legislature of March 25th, 1844. (See Digest of 1852, p. 440.) Which, upon the hearing, was made absolute by the Judge of the Sixth District Court, for reasons and arguments assigned in his opinion; from which opinion and judgment *Crenshaw* appeals, and prays to have the same reversed, because it is manifestly contrary to law, and the decisions of your honorable Court. The act of 1844 creating the office, creates the officer; the act and the officer exist together, and are up to this time intact. The first section names a constitutional officer to the office of Receiver.

The second section is in this language: "The Register of the Land Office shall be appointed by the Governor of the State of Louisiana, by and with the advice and consent of the Senate, and shall hold his office for the term of two years, unless removed in due course of law, and unless all said lands shall be sold before that time, when it shall be in the power of the Governor to discontinue this office, &c.

The third section fixes and defines the oath to be taken. Now the only question in all this controversy is, whether this law is now in force, or whether it has been changed or modified by any subsequent enactment, or by the Constitution of 1852.

The facts are all agreed to, and are these: *Robert J. Ker* was appointed March 30, 1844, March 23d, 1846, and February 12th, 1848. *Richard Loucks* was appointed March 26th, 1850. *William H. Crenshaw,* this defendant, was appointed November 9th, 1851, to take effect November 15th, 1851, for the unexpired term of *Loucks,* resigned. On the 2d day of February, 1852, this appointment, made in the recess, was confirmed by the Senate; and on the 14th day of February, 1852, *William H. Crenshaw* was appointed and commissioned for two years, from the 25th day of March, 1852. According to the statute of the 25th March, 1844, creating this office, and the decisions of your honorable Court in the case of *Bry* v. *Woodruff,* 13th Louisiana Reports, page 556, and of *Kelly* v. *Gilley,* 5 Annual, 534, where you recognize the principle, that an appointment under the law for a fixed period is to hold for that term of time. The language of the statute creating the office of the President of the Board of Public Works, under which the decision of *Bry* v. *Woodruff* was made, is to be found in the Louisiana Digest, p. 45, art. 254, and is in this language:

"The Governor, as soon as may be after the passage of this act, and every two years thereafter, shall nominate and appoint, by and with the advice and consent of the Senate, a President of the Board of Public Works."

The term of tenure of this office is fixed for two years, and is so decided. *Crenshaw's* appointment, under the act of 25th of March, 1844, holds, under the legitimate construction of this decision, up to the 25th of March, 1854, and no appointment can be made in this interval, (unless it is to fill a vacancy,) without a violation of the statute and your decisions. The Governor, then, when he, on the 31st day of March, 1853, appointed *Laurent J. Sigur,* without limiting the appointment to the unexpired term of *Crenshaw,* assumed legislative authority in direct violation of the Constitution and of the law, as defined by your Court, one of the co-ordinate branches of this Government.

The relator, however, considers his nomination by the Governor and confirmation by the Senate, the creation of a vacancy, and the filling the office under the law, or, in other words, that the confirmation by the Senate was a virtual recognition by the legislative department of his appointment. This brings up the powers of the Senate. Now all they do, is simply to advise upon the quali-

fications of the individual named for an office : they have no power to decide an office vacant or not vacant. When they undertake this, they will do what we complain and allege the Governor has done—assume rights that do not belong to that branch, which, when taken in connection with the Governor in making appointments, have only power to advise upon appointments, and can go no further. This, therefore, can confer no authority, unless the appointment is sufficient in all other respects.

The counsel in this argument holds, that the executive office is a continuous source of power, and is not interrupted by the going out or coming in of individuals to the office of Governor ; their names are only used or known in relation to this office to mark the epoch. An appointment made under the law, and properly made, as in this case, is not made in reference to the political prejudices of the individual who exercises executive authority, but is made by this fountain of power, for the public service ; and when the office is for a fixed period, it is then completely beyond the reach of the executive or the appointing power, so far as the power of the executive is concerned. This has been so held by the first tribunals known to our laws. The Supreme Court of the United States held, in the case of *Marbury* v. *Madison*, (see vol. 1 of Peters' Condensed Reports of the Decisions of United States Supreme Court, p. 267) "that the power of the executive over an officer not removable at his will, ceases when the constitutional power of appointment has been exercised by the last act required of him, which is the signing the commission." If the officer is not removable by the executive, the rights acquired by him under the appointment are not resumable by the executive. There appears to be this difference between an office limited in its duration and tenure, and one held by the sufferance of the executive will and pleasure. That under the one of limited duration, the officer acquires certain fixed rights, those given by the law of creation. In the other instance, he acquires no fixed rights. For in the case of *Marbury* v. *Madison*, the Court held that when an officer is removable at the will of the appointing power, a new appointment may be immediately made, and the rights of the officer superseded and terminated. All commissions issued (to officers whose office is not limited by the creation) by the President, expressly declare the reserved rights of the executive department to remove the officer at his pleasure, and he takes the office with this distinct understanding. This, then, if the Court please, is the law, and the understanding of the law, by the defendant and his counsel.

The relator concedes that *Crenshaw* was properly appointed, commissioned and qualified, on the 14th of February, 1852, under the act of 25th March, 1844, Register of the Land Office, and is Register, so far as that appointment, commission and qualification can make him. But he contends, and the Court of the first instance holds, that the Governor has the right to remove, or that the Constitution of 1852 gave to the Governor elected under it, the power to remove and re-appoint all the officers known to the laws or Constitution. This power is claimed and decided upon, under the schedule, and under Articles 142, 143, 144 and 145, embraced in the Constitution. Now let us inquire how far this view of the case can be relied on. Schedule, according to Webster, ( and his definitions are popular with the Judge *a quo,*) means a piece of paper or parchment annexed to a larger writing, as to a will or a deed, or a piece of paper containing an inventory of goods. I choose then to consider it as an inventory of powers given, or as a direction or indication of the manner in which they are to be carried out.

The case in 3d Martin, page 2, *Bermudez* v. *Ibanez*, and of *Dufau* et al. v. *Massicot* et al., p. 291, show to the Court of that day, and they held that the schedule of the Constitution of 1812 intended that the organization of the territorial Government, controlled by the acts of Congress, and ruled by officers appointed by the President of the United States, should continue until the territory was duly and properly admitted into the Union of the States, by accepting the Constitution prepared by the Convention, called in accordance with the acts of Congress, authorizing the people of the territory of Orleans to form a Constitution and a State Government, for admission of said State into the Union on an equal footing with the original States, and for other purposes.

These decisions were good law, and I do not desire to controvert them ; for if the territorial organization did not continue, there was none ; for this Constitution had to be accepted by Congress, and the State, under the Constitution,

admitted into the Union before the officers of federal appointment and Government under the order of Congress, could be superseded. Therefore, the decision could not be otherwise. But the difference of a sovereign State amending, either by enlarging the power of its citizens, or explaining more explicitly the powers of any or all the branches of the Government, is manifestly different from an effort by permission of a superior power to an inferior, to form its organic law, and to be permitted (if the law adopted by the inferior is accepted by the superior) to assume equal rights of sovereignty with each of the individualities who constitute the superior power. Will the Court assume the ground in this decision taken by the Court below, that there was no necessity to submit this Constitution of 1852 to the people for their approval? How this doctrine could hold, if it were necessary here to controvert it, is not necessory to discuss. I refer to it, to express my dissent. This argument is to show the absurdity of the argument that the case of the officers holding under the statute of the sovereign State of Louisiana, are in the same category with the officers who held under the President of the United States and acts of Congress, when we went out of the territorial dependency into the State Government. Now if my view of the definition given by Webster of the schedule is correct, to wit: an inventory of the powers given, and an indication of the manner in which these powers are to be exercised, let us see what are the powers given. Article 47 of the Constitution of 1852, in relation to executive power, provides that he shall nominate, by and with the advice and consent of the Senate, appoint all officers, whose office is established by this Convention, and whose appointment is not therein otherwise provided for. Provided, however, that the Legislature shall have a right to prescribe the mode of appointment to all other offices established by law. The Section 48 gives the power to fill vacancies occurring in the recess; the other Articles, to Article 60, enumerates all other powers given to the Governor, which are inventoried in the schedule of powers given; now to the exercise of the power given in Article 47, that the Governor shall, by and with the advice and consent of the Senate, appoint all officers whose offices are created by this Constitution, and whose appointment is not therein otherwise provided for, we have no possible objection. The proviso to this Article is made for our benefit, and we claim its protection. It is this, provided, however, that the Legislature shall have a right to prescribe the mode of appointment to all other offices established by law. We claim the enforcement of this proviso, and abide by it. Does the schedule repeal this Article? or is there anything in the schedule contrary to it? Then if the Legislature has considered the mode of appointment already prescribed sufficient, and we have been appointed in a mode which was satisfactory to the legislative department, how can the executive department, without a violation of the legislative department, make an appointment to this office of Register during the term for which *Crenshaw*, the defendant in this action, has been appointed. More particularly when Article 143 of the schedule expressly declares all rights, actions, prosecutions, claims and contracts, as well of individuals as of bodies corporate, and all laws in full force at the adoption of this Constitution, and not inconsistent therewith, shall continue as if the same had not been adopted. The law of the 25th of March, 1844, was in force and not inconsistent with any Article of this Constitution, and is recognized to be in full force by the legislative department, because they refused, as will be seen by the journals, to suspend the sales of the public lands, and have passed numerous acts, directing the manner of entering the land and disposing of the proceeds. Then by this Article 143 of the schedule, the act of 1844, creating this office, is still in force. The effort to distinguish between the office and the officer created by this act must fall. The act exists, office and officer, as a whole; the statute must survive or fall as a whole.

If the statute is in full force and *Crenshaw* was duly appointed under it, you cannot remove him, without further legislation—more particularly when Article 144 says that no office shall be superseded, not officer, for there are a class of officers who would, under the Constitution of 1845, hold offices in direct opposition to the provisions of this Constitution. Consequently they have properly said: "In order that no inconvenience may result to the public service from the taking effect of this Constitution, no office shall be superseded." Would they have said this, if these offices were not to be filled in a different manner? Here is the solution to the great difficulty, that has required so many *Constitutions* to illustrate.

The offices are to be filled in a different manner, and are not superceded, but the laws of the State relative to the duties of the several offices, executive, judicial and military, shall remain in full force, though the same be contrary to this Constitution. How, contrary this Constitution? Why, because their mode of appointment has been changed by this organic law, they being Constitutional offices. Their several duties shall be performed by the respective officers of the State according to the existing laws.

What offices? Those of the Constitution just mentioned, until the organization of the Government under this Constitution and the entering into office of the new officers to be appointed under said Government, and no longer. Now, if this does not fully prove my notion of the schedule to be correct, I am' free to confess my error. If the view of the relator and judge is right, and the Register is a statutory officer, and is one o₁ those meant here—then the moment *Mr. Sigur*, the relator, is qualified and enters upon the duties of his office, as one of the new officers created by this schedule, then the law creating his office ceases to exist. But the laws of the State, relative to the duties of the several officers, executive, judicial and military, shall remain in full force, though the same be contrary to this Constitution, until the new offfcers are appointed, and no longer.

Now, is it not most clear that this Article only applies to those new officers to be appointed, who would have held, in opposition to the elective principle adopted by the Constitution to which this schedule is annexed? With this understanding all appears clear. The statutory officers remain with the statute—these are not superseded. Officers of a limited tenure remain, and cannot be removed by the executive branch of the Government.

Those of unlimited duration are at his mercy, because Article 96 of the Constitution of 1845, is superseded by this Constitution, and this class of officers are governed by this statute of creation. I have, perhaps, trespassed too much upon the time of your Court. When I have the case of *Trepagnier* v. *Crozat* before me, and perceive from the tenor of that decision the Act of 1811, which gives this appointment to the Governor, is recognized by your Court as the source from which he derived the power to make the appointment.

If the reasoning in that case, against which the Judge *a quo* in this case has argued so learnedly, going into elementary principles of public policy, and deducing the power of the Governor, and, therefore, his duty to make this appointment, to organize a Government already organized—to use a power not exercised or claimed by the individual who exercised executive authority under the Constitution of 1845—I say again if the reasoning in that case is to be applied to this case, there can be no reasonable doubt that your honorable Court will reverse the judgment we complain of, and dismiss the petition of the relator, because he cannot take this office with the appointment he has under the Act of March 24, 1844.

*J. M. & E. M. Elam.*

1st. All offices are creatures of the organic law ; or of Legislative enactment, which designate the manner in which the officers shall be appointed. After the appointment of the officers, they are removed from under the control of the appointing power, unless the duration of the office, or the term of the officer is left expressly at its will. 7 Cranch. 505.

2d. The constitution of 1845 was superseded by the constitution of 1852, but all laws in force at the time of its adoption, not inconsistent therewith, shall continue as if the same had not been adopted. Art. 143. Laws contrary to the constitution, requiring duties to be performed by the several officers, executive, judicial and military, to remain in force, and the duties of the several offices to be performed as those laws require, until they were changed, to conform to the constitution ; "and as to the organization of the government, under the constitution and the entering into office of the new officers to be appointed under said government and no longer." A government is to be organized by the Legislature in conformity with the constitution ; new officers appointed in the manner the constitution requires are to supersede the old. All this had nothing to do with the Act of 1844, or the Register of the Land Office.

3d. The IDEA that a government—the embodiment in FORM of the sovereignty of a people of a State, is to be assimilated to a private corporation, is a retrogression in political science. There is at least this difference between them. The *form* of a government may be abolished—the constitution changed,

SIGUR<br>v.<br>CRENSHAW.

while sovereignty, which is a self-existing, indestructible essence, continues to exist. The private corporation, created for specific purposes, and for the benefit of certain persons, receives its form, its constitution and franchise, with its charter, all spring into existence with the same breath; and expires at the same moment. The franchise is not a self-existing and indestructible essence as sovereignty is, which can assume a new form, when the old form or embodiment has crumbled into "*nothingness.*"

4th. If the Act of 1844, creating the office of Register, is not contrary to the constitution, or the government established under its authority, the removal of the defendant is contrary, both to the Act of 1844 and the constitution, unless he was removed in due course of law.

*Sigur*—Supplemental Brief.

I have shown, in the brief filed when this case was submitted, that it was a universally admitted principle, derived from the soundest rules of law and common sense, and acted upon by all the conventions which have from time to time assembled in the different States of the Union, to frame a constitution or to remodel and recast the existing one.

1. That the adoption of the new constitution, or as it is sometimes called, the new "form of government," (see Sec. 9, Const. Mass.) supersedes the old one in every and all its parts, and specially,—

(a) That all the officers, of every grade, class and description, deriving their authority from, and holding under the appointment of any branch or department of the defunct constitution, whether they have been elected or appointed to office, or whether their tenure is for life or for a term of years, are "*functi officiis*," by the fact of the adoption of the new constitution.

I have shown by the explicit texts of our State constitution, and by the decisions of our own Courts,

2. That "to the end that there may be no failure of justice, or danger arise to the Commonwealth," and "no inconvenience ensue to the public service," from this sudden and simultaneous death of all officers of the State, "it became necessary, in the language of *Judge Matthews*, in order to avoid ANARCHY, to create a kind of intermediate (and temporary) government, the duration of which would expire when the permanent governments were organized and went into operation;" that "these two governments (the temporary and permanent,) are DISTINCT AND SEPARATE;" that "THEY ARE TO SUCCEED ONE TO THE OTHER;" that "THEY CANNOT BE BLENDED IN WHOLE OR IN PART."

(a) That these temporary or intermediate governments are generally formed and constituted with the "personnel" of the old government, by continuing them in their respective offices, "UNTIL they are superseded under this (the new) constitution," or "UNTIL the organization of the new government," or UNTIL the end of the first session of the Legislature, under this (the new) constitution," or "UNTIL" some stated day during or shortly after the first session of the first Legislature assembling under the new constitution. In some cases, as in the constitution of New Hampshire, the Legislature is authorized to fix the time when the new constitution shall take effect, and directed to make the necessary arrangements for the organization of the new government, in order that "there may be no failure of justice or danger to the State." (See Const. N. H., under the head of "Oaths and Subscriptions, &c.;") all these provisions manifesting plainly the intention of these conventions, that the then existing organization should last only UNTIL the new one could be framed and set in motion, and "no longer."

(b) That whenever the framers of the constitutions of our sister States have thought proper to deviate from the general principle and to make a distinction between one class of officers of the defunct government and another, with a view to continue one in office after the organization of the new administration, they have deemed it necessary to do so in express terms, and by a special provision, which would have been useless, and the "vilest tautology," in any other hypothesis than the one for which I have contended. These special provisions, these specific exceptions, would be useless and meaningless, unless they are regarded as recognitions of the general principle, and as so many admissions that, without them, the excepted officers would have followed the fate of all the others, embarked in the same discarded hulk. Thus the constitution of Ohio, of 1852, (sec. 5 of schedule,) provides, "that the *Register and Receiver of the Land Office,* Directors of the Penitentiary, Directors of the Benevolent Institu-

53

tions of the State, the State Librarian, and all other officers not otherwise provided for in this constitution, in office on the first day of September, 1851, (the day on which the constitution, if adopted, was to take effect,) shall continue in office UNTIL THEIR TERMS EXPIRE RESPECTIVELY, unless the General Assembly shall otherwise provide." The constitution of Kentucky provides "that all officers, now filling any office or appointment, shall continue in the exercise of the duties of their respective offices or appointments, FOR THE TERMS THEREIN expressed, unless by this constitution it is otherwise provided."

The Constitution of Texas, continues all the officers of the Republic, "until the organization of the State government," and ordains that, "THEN the offices of President, Vice President, of the President's Cabinet, Foreign Ministers, Charges, Agents, and others, REPUGNANT to this constitution, shall be superseded by the same, and that ALL OTHERS shall be holden and exercised until they expire by their own limitation, or be superseded by the authority of this constitution."

Here we have the distinction clearly made between those officers of the old government whose terms are curtailed, either expressly and by implication, by the new constitution, and those whose terms are not affected by any express provisions or any implication from an express provision. Now what could have been the object and purpose of this distinction, and what the reason for this express provision, continuing the latter class of officers, who are "not provided for" in the new constitution, and who are "not repugnant" to it, UNTIL their commissions expire by their own limitation," or "for the terms expressed in their commission," or "until their terms expire respectively," if, as the counsel for the Respondent contend, all the officers of the old government (except only such whose terms were "otherwise provided for," or whose tenure was inconsistent with, and repugnant to the new constitution,) were entitled to retain their offices by the force of their original appointment, or by virtue of the continuance of the law regulating the duties of their offices? Let us take the special case of the Register and Receiver of the Land Office of Ohio, the office in dispute in this case, mentioned in sec. 5 of the schedule of the constitution of that State, quoted above. It was an office of legislative creation, as the Land Office at Baton Rouge is. It was established by an Act of February 12, 1829, entitled "An Act to provide for the sale of certain lands granted by Congress to the State of Ohio," which was afterwards amended by an Act of March 31, 1837, entitled "an Act to provide for the removal of the State Land Office from Tiffin," (see Ohio statutes of 1829 and 1837.) By these Acts the appointing power was vested in the Governor, which the Legislature was authorized to do under Art. 6, sec. 4, of the constitution of 1802.

The constitution of 1852 introduced no change in the said office, or in the mode of appointment of the Register. It continued the law in force and retained, "*iisdem verbis*," the article above referred to, authorizing the Legislature to confer the appointing power upon the Executive, in all cases not otherwise provided for. See Art. VI, sec. 4, Const. Ohio, of 1852. Indeed, the article of the schedule of the constitution upon which I am commenting, admits that the offices and officers enumerated are not "otherwise provided for," than by the laws creating them and prescribing the mode of appointment, and the Court will see, by looking at that constitution, that there is nothing in these offices or in the mode of appointment to them, which is "inconsistent with or repugnant to" that constitution; that, on the contrary, they are in perfect accordance with its express provisions. Now, I ask again of the counsel for the respondent, what could have been the prompting motive or principle, what the necessity of this provision, continuing this Register and Receiver of the Land Office, and other subordinate officers in the executive department, "UNTIL THEIR TERMS EXPIRE RESPECTIVELY?" Their offices were created by the Legislature and not by the constitution; the laws creating them were continued in force, without any change or modification by the first section of the schedule of the constitution of 1852; the mode of appointment remained the same under the new constitution. Can any plausible reason be assigned for this special provision, for this distinction made "*ex industria*" between one class of officers and another, if, as the counsel of the respondent urge, the provisions of this and of other constitutions, of our own among the rest, continuing the officers of the old government in office, were necessary ONLY in the case of, and therefore must apply SOLELY and EXCLUSIVELY to such officers of the old gov-

ernment whose duties, term of tenure or mode of appointment, were changed, altered or curtailed by an express provision of the new constitution, or were inconsistent with or repugnant to some part of it? Is it not very clear, from the whole tenor of the schedule of this constitution, as well as from the whole complexion of this particular provision, that the Convention which framed the constitution of Ohio, acting upon a principle which had been a land-mark to all the other constituent assemblies of their sister States, HELD that unless a special exception was made for the officers enumerated in sec. 5 of the schedule, they too would fall with the superseded government, even though their term of service, duties, or mode of appointment had been in no wise affected by the new constitution, or, at least, by any express provision of it, or any implication from an express provision? Let the counsel for the respondent point out any clause or provision of the constitution of Louisiana, of 1852, or even the one single word in that instrument, conveying an intimation that the Convention intended to except the "Register and Receiver of the Land Office at Baton Rouge" from the operation of the general rule and to continue him in office "until his commission shall expire." They must, in my humble opinion, do nothing less to obtain the reversal of the opinion of the inferior Court.

Having shown by the almost uniform practice of all the Conventions which have framed our State constitutions, (which is the highest authority when a question arises as to the proper interpretation of any part of these constitutions,) that the principle which is the ground work of my argument was as uniformly adopted and acted upon by them—that it was, as I have seen it called, a principle of the constitutional Common Law of the land—I have proceeded to show:

3d. That the framers of the present constitution of our State had adopted and acted upon it, in all its length and breadth, in various provisions of that instrument and specially in the schedule.

(a) That they expressly declare, in Art. 142, that the constitution of 1845, is superseded by the constitution of 1852, which is left to inference in other State constitutions.

(b) That "to carry this new constitution into effect," (Art. 142 in fine,) to lay, as it were, the foundation of the new order of things, they "continue all laws not inconsistent therewith," and confirm rights already acquired, &c., &c., Art. 143.

(c) Assuming that as soon as the new constitution was proclaimed, the whole machinery of Government established under the old would fall to pieces and leave the people without an administration for the whole time intervening between the dissolution of the old and the organization of the new government, they provide a remedy for the inconvenience "which would result to the public service" from this State of ANARCHY, by creating a temporary or intermediate government, as *Judge Matthews* calls it. They enact that,

"No OFFICE shall be superseded by the adoption of the new constitution;" that is to say, "no office shall be made void, useless, inefficacious," (see Webster, verbo supersede,) but that all the OFFICES, whether they be executive, judicial or military, (the legislative offices are provided for elsewhere,) and whether they be repugnant to the constitution or not, shall remain as they are; for it is plain that the word OFFICES, in the first branch of the sentence, and "the laws relative to the duties of the several officers, &c.," in the second, connected by the conjunctive BUT, are used as equivalent terms and phrases, the latter being in fact the definition of the former. All the OFFICES of the State are all the laws defining the duties of the SEVERAL OFFICERS of the State. Thus the true reading of this sentence, substituting the words "NO OFFICE," in its first part, their equivalents, which are to be found in the second, would be, "none of the laws of the State relative to the duties of its several officers, executive, judicial or military, shall be superseded or made null, void or useless, but these laws shall remain in full force, though contrary to this constitution." I beg leave to direct the attention of the Court to this observation, which, however obvious it may appear after a little reflection, does not seem to have occurred to many who have taken part in this controversy in or out of Court. These, as well as the counsel for the respondent, sometimes confounding the meaning of the words "offices" and "officers," sometimes giving to the word "superseded," a signification which it has not, and sometimes neglecting the connection of the first branch of the sentence with the second, which is explanatory

SIGUR
*v.*
CRENSHAW.

of its meaning, have contended that the words "NO OFFICES shall be superseded thereby," were sufficient to continue, and were actually intended to continue all officers in office—that they meant nothing more nor less than, "no offices shall be VACATED thereby." This is almost too absurd to require serious refutation; for the most cursory examination of Art. 144, must convince any one that such an interpretation would render the different provisions of that article confuse, contradictory, tautological, and even ungrammatical, besides giving to words a signification which they cannot have, either in legal or common parlance. The sentence, according to this version, would read thus, "all the officers of the State will continue in office notwithstanding the adoption of this constitution: BUT the laws of the State relative to the duties of the several officers, executive, judicial and military, shall remain in full force, though contrary to this constitution." What a wry face the particle BUT makes here! The inventors of this new reading say, that *Judge Eustis* did not exactly understand the meaning of and the shades of difference between BUT and AND, and admit that had they been chairmen of the committee on style, (this article is copied *literatim* and *verbatim* from the constitution of 1845,) instead of the learned and scholar judge, they would have used the latter conjunction.

(d) The next step taken by the Convention to prevent the inconveniences which would ensue from the adoption of the new constitution, superseding that of 1845, was to continue the then acting officers in office, "until the organization of the new government under the new constitution, and the entering into office of the new officers, to be appointed under said government and NO LONGER." The words used to affect this, are the largest and most comprehensive; "and the *several* duties shall be performed by the respective officers of the State, according to the existing laws, until, &c. The terms, 'several' and 're-spective,' include the ideas of classes and relation, and evidently refer to the "executive, judicial and military officers," mentioned in the preceding sentence. These "several duties" are the duties prescribed by the laws relative to the executive, judicial and military officers of the State, whether these laws be contrary to the constitution or not; the "respective officers," are the officers of the several classes enumerated—the officers filling the executive, judicial and military offices—in a word, all the officers of the State; for the terms, continuing the officers, are evidently, from their connection, co-extensive with the terms continuing "the laws, relative to the duties of the several officers, executive, judicial and military." Besides, the same motive which prompted the Convention to continue ALL the laws regulating the duties of the several officers of the State, "though the same were contrary to this constitution," (which it was not disputed, included also the laws that were not contrary to this constitution,) precludes the idea that they could have admitted, or did intend to admit a distinction when they came to provide for the filling of those offices. "*Eadem ratio, eadem lex.*" They have, on the contrary, employed the most comprehensive language, excluding all distinction or exception, which, taken in connection with the preceding sentence, cannot leave the slightest shadow of a doubt in any candid mind.

(e) But how long were these officers, all and every one of them, continued in office? The answer given by the concluding sentence of Art. 144 is explicit. Until the organization of the Government under this Constitution, and the entering into office of the new officers to be appointed under said Government, and "no longer." "This organization," as Judge Matthews says, "was not the work of a day, as some persons may have fancied. It was to take place by degrees." The election of the Executive, provided for by the Constitution itself, was the first step towards the "organization" of his branch of the Government; when afterwards the Legislature met, and the Senate was at hand to exercise with the Governor the appointing power, the Executive department was, *quoad hoc,* fully organized, and all the officers of that department, who by the laws or Constitution held their offices under it, and by its appointment became liable to removal, or re-appointment, and were "*functi officiis*" as soon as the new officers had qualified, and were ready to "enter" upon the discharge of their duties.

It has never been pretended that the words "and the entering into office of the new officers to be appointed under said Government," consituted a separate and substantive term, distinct from the term established by the words "until the organization of the Government." Such, or similar words, are to be found

in most of the Constitutions and in laws fixing the limits of the tenure of public officers, to provide for occasional and sometimes necessary deviations from these limits. They are modalities or modifications of those terms.

The positions assumed by the counsel for the respondent, besides the refutation which they have already received in the course of this argument, may be briefly, directly and conclusively answered.

The first position is, that " Article 144 applies only to such officers as would hold in opposition to the elective principle established by the Constitution of 1852."

My answer is,

1o. The principle which dictated Articles 142, 143 and 144 of the Constitution of 1852 is broader than the one assumed in this argument and includes all officers, without distinction.

2o. Article 144 excludes all distinction, not only by using the most general and comprehensive terms, but by enumerating officers whose mode of appointment is in no wise affected, changed or altered by the new Constitution, to wit: " military officers," besides a host of executive and judicial officers whose duties, terms of office and mode of appointment remained untouched by the new organic law. I say that the article "enumerates those officers," because I assume, what I think cannot be disputed, that the sentence "and the several duties shall be performed by the respective officers of the State," refer to the "several duties of the executive, judicial and military·" departments, and that the "respective officers" can be none other than the "executive, judicial and military officers;" so that, although the enumeration is not made in the last clause of the sentence, it is clearly carried into it, by the most obvious grammatical implication. If the Convention intended to except the Register and Receiver of the Public Lands from the general rule, they would have said so in so many words. It is a rule of law and of reason that exceptions to a general rule are not presumed. " *Exceptio fit, non derivatur.*"

The other position is, that the Constitution of 1852, by continuing the law creating the Register and Receiver of the Land Office and defining the term and mode of appointment of that officer, continued him in office for the full term of his appointment.

To this I answer,

1o. The Constitutions of the different States and our own, more especially, clearly show that in the opinion of their framers, the provision continuing the laws relative to the duties of the several officers of the State, was not sufficient to continue the OFFICERS. They all contain separate and distinct enactments for the former and for the latter. The Constitution of Louisiana of 1852, besides the general provision maintaining in full force " all laws not inconsistent therewith, contains a special one in Article 144 "for the laws relative to the duties of the several officers of the State," whether they be contrary to the Constitution or not. Now this provision being a special one referring particularly to officers, the counsel for respondent must rest their pretensions upon it, and not upon the general one in the preceding article. But if those pretensions were well founded, what would be the use or meaning of the sentence immediately succeeding, continuing the officers? Do they suppose that, all through this schedule, the Convention has been dealing in mere idle, unmeaning tautological verbiage?

2o. The continuance of the OFFICE has not *in fact*, and therefore has not *in law*, the effect of continuing the OFFICER. For, although the " officer " cannot exist without the " office," the " office " can and often does exist without the "officer." *Crenshaw* might die and the office remain vacant for days, for weeks. The Legislature might neglect to make provision for the election of a successor to the incumbent of an office, as in the case of *Houston* v. *Royston*, in 7 How. Miss. Rep. 543. In another case, of *Smith* v. *Halfacre*, 6 How. Miss. Rep. p. 602, the office was created by the Constitution of 1832, but the officer was elected only in July, 1836. Chief Justice Sharkey, *arguendo*, says: "We cannot agree with counsel that the office of Judge of the 8th Judicial District was an office created by the Legislature. The *District* was created by the Legislature, but the office was created by the Constitution. The Constitution created the office without any reference to any District. There was no Judicial District at the time the Constitution was adopted: all Districts had been abolished. As well might we say, therefore, that the Legislature created the office of Circuit

Judge for the four Districts which were organized or established by the first Legislature which met in January, 1833. The Constitution provided that the State should be laid off into convenient Districts, and when so laid off Judges were to be elected by virtue of the Constitution, and not by virtue of the law." Did the fact of the non-existence of an incumbent, in these cases, carry with it the destruction of the offices and the repeal of the laws creating them? Surely not; for there is no necessary connection between the existence of the latter and the former, which the argument of the respondent's counsel assumes.

It has been less my object, in this brief, to introduce any new matter or argument, than to arrange the matter and arguments of my former brief, which was hurriedly written, whilst suffering from a violent migraine, in a more logical form. I have only to beg the Court to excuse me for this additional infliction, and to urge in extenuation of the offence, and some slight consolation for the Court, that Cicero "pro domo sua" is much more tolerable in writing, than *viva voce*, as the amiable and patient Judge of the inferior Court may attest.

SLIDELL, C. J. .The Convention did not amend the Constitution of 1845, but framed a new Constitution. By the express terms of Art. 142, the Constitution of 1852 was to supersede the Constitution adopted in 1845. The natural consequence would seem to be that the Government which existed under, and by virtue of this old Constitution, would be simultaneously superseded. But, as time was necessary for the organization of a new Government under the new Constitution, and as great inconvenience would result from the *interregnum* which would otherwise occur between the displacement of the old Government, and the organization of the new, to prevent this inconvenience the Article 144 was framed. The desired object was secured by the simple expedient of continuing the old officers in service, until the new Government should be organized and the new officers enter into office. Such I understand to be the true spirit and meaning of the schedule.

I find it impossible to reconcile the pretensions of the defendant, with the emphatic words "*and no longer,*" which are used in Article 144. If it was intended, as he argues, that the old incumbents were to hold until the expiration of their respective terms of office, those words would be mere surplusage. For no doubt could arise but that they could be ousted at the expiration of their terms, by new appointments.

The construction claimed by the plaintiff is strengthened by a reference to Constitutions of our sister States, which he has cited. Some of them exhibit express reservations in favor of antecedent officers, continuing them in office during their unexpired terms, or until some stated day, reservations which would have been surplusage, because implied, if the defendant's argument be sound. In our Constitution no such express reservation is found. The officers, executive, judicial and military, are to perform their duties "*until* the organization of the Government under this Constitution, and the entering into office of the new officers to be appointed under said Government, and *no longer.*" The last words seem to have been used out of abundant diligence and caution, to exclude implication and shut out just such a discussion as is raised by the defendant.

I think the judgment should be affirmed.

CAMPBELL, J. I concur in the opinion just pronounced by the Chief Justice, and think the judgment should be affirmed.

OGDEN, J. The relator was nominated by the Governor, and with the advice and consent of the Senate, appointed Register of the Land Office, at Baton Rouge, *for the term of two years*, commencing on the 31st of March, 1853. His right to the office is contested by the defendant, who claims it by virtue of a

commission from *Governor Walker*, under the former Constitution of 1845, conferring the same office on him for the term of two years, from the date of his commission, the 14th of February, 1852. The question involved is, whether by the correct interpretation of the Constitution of 1853, it was the duty of the Governor elected under that Constitution, with the advice and consent of the Senate, to make new appointments to all offices in the State, then held by virtue of commissions from the Executive, under the superseded Constitution of 1845. This question was not decided in the case of *Trepagnier* v. *Crozat*, because it was not considered as necessarily involved in a case where the office, by law, was held at the pleasure of the Executive. According to our theory of Government, a written Constitution, adopted by the people themselves, precedes the enactment of municipal laws to govern them, and is the necessary basis for a superstructure of what we recognize, and call a Constitutional Government. In most of the State Constitutions, as in our's, there is a mode provided for such changes and additions to organic law as experience may prove to be wise and proper. Such alterations, therefore, consistently with the acknowledged theory, may take place without disturbing the existing organization of the Government, but where the people, in the exercise of their sovereignty, deliberately put an end to the existing Constitution, and adopt an entirely new one in its stead, all powers of Government under the old Constitution necessarily cease, except in so far as they are maintained in existence by the new Constitution. No one has such a vested right to office as to resist the necessary consequences of an entire abrogation by the people of the Constitution, under the authority of which he holds it. Rights to property and the obligation of contracts stand on a different footing, and I do not understand Article 143 of the Constitution as applicable to the right to an office—the sense in which the term is used in that Article, in my opinion can have no such meaning. Such a construction would also be inconsistent with the two following Articles. Article 144 declares that in order to prevent inconvenience to the public service from the taking effect of the new Constitution, no office shall be superseded thereby, and directs that the several duties shall be performed by the respective officers of the State, according to the existing laws, until the organization of the Government under the new Constitution, and the entering into office of the new officers to be appointed under said Government, and *no longer.* The next, Article 145, declares "appointments to office by the Executive, under this Constitution, shall be made by the Governor, to be elected under its authority." I consider from these two Articles in connection, that the design of the Convention, as therein expressed, was to prevent the consequence which otherwise would have ensued, of all offices being vacated immediately on the adoption of the new Constitution, and at the same time to limit the period of continuance in office of the officers under the old Constitution, and to provide for the appointment of their successors under the authority of the new Constitution. A different construction would, in my opinion, leave some of the expressions used in these Articles without any meaning or effect whatever. I cannot regard the Constitution of 1852 as merely a change in some respects of a subsisting State Government, and I think that could not have been the sense of the Convention, from the fact of their taking especial care in the schedule to guard against the inconveniences of passing from under an old Government to an entirely new one. The cases of *Bermudez* v. *Ibanez*, and *Massicot* v. *Dufau*, 3 Martin R., O. S., appear to me fully to sustain this view of the subject, and I see nothing in the circumstances of this case

which requires the application of a different principle from the one determined in these cases. My conclusion is, that by the Constitution, the Governor had the power, with the advice and consent of the Senate, to make a new appointment to the office in question, and that on the appointment of the relator being made, by effect of the new Constitution, the defendant's right to the office ceased.

The judgment of the Court below, in my opinion, should be affirmed.

BUCHANAN, J., (dissenting.) The respondent and appellant, *W. H. Crenshaw*, was appointed Register of the Land Office at Baton Rouge, on the 9th November, 1851, during the recess of the Senate, to fill the unexpired term of *Loucks*. This recess nomination was confirmed by the Senate on the 2d day of February, 1852. On the 14th of the same month and year he was again nominated by the Governor, and confirmed by the Senate, for the full term of two years.

He furnished the required bond and took the oath of office on the 16th day of March, 1852.

The relator, *L. J. Sigur*, was nominated by the present Governor of the State and confirmed by the Senate on the 31st day of March, 1853, Register of the Land Office at Baton Rouge, for two years, commencing on the 31st of March, 1853, the date of his commission. He took the oath of office, required by article 90 of the Constitution of 1852, and furnished the legal bond and security on the 2d day of April, 1853.

*W. H. Crenshaw* having refused to vacate the office and to deliver the papers, books, charts, maps, &c., appertaining to it, to the relator, the latter sued out a mandamus to compel him to do so. From the judgment of the Court, making this mandamus peremptory, *Crenshaw* has appealed.

The facts, as stated above, are admitted: and the question which has been submitted for our decision is: Had the term of office of *Crenshaw* expired when the Governor appointed *L. J. Sigur* to succeed him?

The statute which created the office in question, was approved the 25th March, 1844. Its second section reads as follows: "The Register of the Land Office shall be appointed by the Governor of the State of Louisiana, by and with the advice and consent of the Senate, and shall hold his office for the term of two years, unless removed in due course of law, and unless all said lands shall be sold before that time, when it shall be in the power of the Governor to discontinue the office," &c.

The term of office was thus fixed at two years by the statute creating the office ; and the Executive has followed the letter of the statute in the commission issued to the respondent on the 14th February, 1852. Having qualified under that commission, the respondent acquired a right to hold the office, with all its emoluments, for the period of two years from the said date, unless removed in due course of law.

But the relator contends that the adoption of the present State Constitution, in November, 1852, had the effect of dissolving the whole frame of government which existed under the antecedent State Constitution; that those holding office under the former constitution would have been of necessity ousted, and the offices themselves annulled, had it not been for the insertion of a schedule designed to continue them in existence provisionally, until another organization could be perfected under the new constitution ; and this merely for the purpose of preventing the anarchy which would have otherwise resulted.

This argument necessarily directs our attention to the schedule of the Constitution of 1852. There are eight articles in that schedule, of which only two require to be examined in connection with the present subject.

"Article 143. All rights, actions, prosecutions, claims and contracts, as well of individuals as of bodies corporate, and all laws in force at the time of the adoption of this constitution and not inconsistent therewith, shall continue as if the same had not been adopted.

"Article 144. In order that no inconvenience may result to the public service from the taking effect of this constitution, no office shall be superseded thereby; but the laws of the State, relative to the duties of the several officers, executive, judicial and military, shall remain in full force, though the same be contrary to this constitution, and the several duties shall be performed by the respective officers of the State, according to the existing laws, until the organization of the government under this constitution, and the entering into office of the new officers to be appointed under said government, and no longer."

These two articles of the Constitution of 1852 are not inconsistent. They must, therefore, be construed in reference to each other. If anything in the one should be found ambiguous or obscure, we are permitted to search in the other for such light as it will afford, to dispel the obscurity.

The argument of the counsel for the relator may be fairly and briefly stated as follows: "Article 144 declares that the respective officers of the State shall continue to perform the duties of their respective offices, until the entering into office of officers appointed by the government, organized under the present constitution, *and no longer*. The emphatic words *and no longer*, create a tenure of office applicable to all offices existing in the State at the time of the adoption of the constitution, and whether mentioned in that instrument or not. If the holders of such offices were not *ipso facto* displaced by the adoption of the new constitution, it was (in the words of article 144,) 'that no inconvenience might result to the public service.' But the constitution contemplated that the new government should have the appointing power, fully and universally, untrammelled by any previous appointments, or by the term of office specified in any previous Act of the Legislature, or commission granted under the same."

In the application of article 144 of the constitution to the present case, the relator contends that, inasmuch as he has been appointed Register of the Land Office by the government organized under this constitution, and has taken the oath of office prescribed by the constitution, it results that the respondent is *no longer* qualified to discharge the duties of said office, notwithstanding his commission is not yet expired, by its terms.

It is true, as contended by the relator, that the words of article 144 are general enough to include every office in the State, whether mentioned in the constitution or not; and the construction, contended for by him, would probably be entitled to our assent, were it not for the provisions of the article 143, which, as I think, have restricted the operation of article 144.

All rights of individuals, and all laws in force at the time of the adoption of the constitution of 1852, not inconsistent therewith, continue as if the same had not been adopted. The Act of 1844 contains nothing, that I can discover, inconsistent with the constitution of 1852. It has declared that the Register of the Land Office shall hold his office for the term of two years. That statute is in full force. The respondent has been appointed under that statute. His term of two years has not expired. He had a right to receive its emoluments.

54

That right has been guaranteed to him by article 143; for his office is not one of those mentioned in the constitution, and of which the tenure was, in terms, altered by that instrument. Had it been such a one, his right to the office must have succumbed under the paramount requirements of that constitution. I feel bound to construe the two articles 143 and 144 in such a manner as to give effect to both, if that be possible. The conclusion to which that rule of construction has led my mind is, that the appointing power of the government organized under the constitution of 1852, is to be exercised with reference to pre-existing laws and to rights acquired by individuals under pre-existing laws, in all cases where such laws and such rights are not inconsistent with the constitution itself.

I cannot concur, to its full extent, in the view taken by the relator of the effect of the promulgation of the new constitution of Louisiana in the place of the old one, which was abrogated; namely, that without some saving clause it would have dissolved the whole frame of government and the obligation of laws previously enacted. Such results belong to revolution, the offspring of intestine commotion, or of foreign conquest, which changes the allegiance of a nation, substituting monarchy, or oligarchy, for democracy, or *vice versâ*—or which reduces an independent State into a subject province. They have nothing in common with the peaceful changes, so frequent in their occurrence, which the combined republics of our political confederation find it expedient from time to time to introduce into the details of administration of a government always essentially the same, because it always recognizes the same source of authority—the people.

Within the last eight years the State of Louisiana has made two of these administrative changes; and we all remember the particular objects for which, on both occasions, the Conventions which remodelled the Constitution, were called together. In 1845, the main ends proposed were universal suffrage, and the restriction of the legislative power in the relation to the chartering of Banks. In 1852, the popular voice demanded an elective judiciary, and a more extended system of internal improvements. The important objects indicated, formed prominent features of the Constitution as remodelled on both occasions; and the articles 143 and 144 of the present Constitution are copied *totidem verbis* from articles 142 and 144 of the Constitution of 1845. The inference I draw from these articles, thus repeated, is directly the reverse of the doctrine which lies at the foundation of the relator's argument. The changes introduced by those Constitutions into our body politic, were not revolutionary. The sanction of the law, the rights of persons, were only disturbed in those cases and to that extent that the Constitution contained declarations inconsistent with particular statutes or particular rights.

These views are in accordance with the construction given by our predecessors to the Constitution of 1845, in the case of *The State* v. *Percy*, 5th Annual, 290.

The researches of the relator have furnished us with proof that similar saving clauses have been introduced into every amended State Constitution that has been framed throughout the Union: but I have seen no precedent for the construction which he seeks to give to that clause in our own constitution.

I am of opinion that the judgment of the District Court should be reversed, and that the mandamus should be refused.

VOORHIES, J.  I concur in the opinion of Justice BUCHANAN.

DECREE.

A majority of the Judges being of opinion that the judgment should be affirmed,

It is, therefore, ordered, adjudged and decreed, that the judgment of the Court below be affirmed, with costs.