THE STATE OF FLORIDA EX REL., P. McQUAID ET AL., RELATORS, VS. THE COUNTY COMMISSIONERS OF DUVAL COUNTY, RESPONDENTS.

1. Special or local legislation as to cities and towns under section 8, of Article 8, of the Constitution, is not controlled by the proviso to section 21, of Article 3, but may be enacted at any session of the Legislature, and without the notice required by such proviso.

2. The Lieutenant-Governor's office, as it existed under the Constitution of 1868, is continued by the present Constitution for at least the balance of the term of such office, and he was authorized to preside over the Senate, at its session in 1887.

3. When an act establishes a municipality covering territory occupied by two existing municipalities and by a part of a third municipality, and the title is an act to establish the new municipality, (stating its name) and to provide for its government and prescribe its jurisdiction and powers, a repeal of the existing charters is matter properly connected with the subject expressed in the title of the act, within the meaning of section 16, of Article 3, of the Constitution.

4. Where the title of an act designates it as one amending another act, but such act, in fact, amends only one section of the latter statute, the title is sufficient under section 16, of Article 3, of the Constitution.

5. The fact that there are two sections of an amendatory act that expressly profess to amend one section of another statute, does not affect the validity of such amendatory sections. Though inartificial legislation, it but substitutes matter in the form of two sections for matter in the form of one section.

6. Where a section, expressly amendatory of another section of a statute, purports to set out in full all it is intended to contain, any matter which was in the original section, but it is not in the amendatory section, is repealed by the omission.

This is a case of original jurisdiction.

The facts of the case are stated in the opinion.

*H. Bisbee, Louis I. Fleming* and *Fletcher & Wurts* for Relators.

*Hartridge & Young* for Respondents.

MR. JUSTICE RANEY delivered the opinion of the court:

This case is one of mandamus to compel the County Commissioners of Duval county to assemble and perform certain duties preparatory to an election to be held in the city of Jacksonville on the first Tuesday in the coming month, under the provisions of statutes passed at the last session of the Legislature establishing such city.

The defendants moved to quash the writ, and the grounds of the motion are as follows:

1. That the statutes are special and local legislation, and no notice has been given of intention to apply for their enactment, as required by the 21st section, of Article III, of the Constitution.

2. That as the Lieutenant-Governor presided over the Senate and signed these acts, they are void.

3. That the title of each is insufficient under the Constitution ; and,

4. That as certain provisions of a section of the original

act, which was amended by the other act, are omitted from the latter, the duties of which performance is sought are not imposed by the acts upon the defendants.

We are urged from sources which must be deemed representative of the welfare of Jacksonville to pass upon the several questions raised, and feel that it is proper we should do so, and will consider them in the order stated.

The 20th section of the third or legislative article of the Constitution provides that the Legislature " shall not pass special or local laws in any of the following enumerated cases: that is to say, regulating the jurisdiction and duties of any class of officers, *except municipal officers,*   *   *   * regulating the practice of courts of justice, except *municipal courts;*   *   *   * for assessment and collection of taxes for *State* and *county* purposes ; for opening and conducting elections for *State* and *county* officers, and for designating the places of voting ; regulating the fees of officers of the *State* and *county.*" There are other cases " enumerated " in this section, but it is not necessary to reiterate them here.

The 21st section of the same article is as follows : " In all cases enumerated in the preceding section, all laws shall be general and of uniform operation throughout the State, but in all cases not enumerated or excepted in that section, the Legislature may pass special or local laws ; *Provided,* that no local or special bill shall be passed unless notice of the intention to apply therefor shall have been published in the locality where the matter or thing to be effected may be situated, which notice shall state the substance of the contemplated law, and shall be published at least sixty days prior to the introduction into the Legislature of such bill, and in the manner to be provided by law. The evidence that such notice has been published shall be established in the Legislature before such bill shall be passed."

The purpose of section 20 is to prohibt the enactment

of any special or local law upon any of the classes of subjects therein " enumerated." It is a restraint upon the legislative power. In view of the fact that the legislative power is free to enact any laws that do not fall within some restraint imposed upon it by the Constitution, it is clear that if this section stood alone there would be no restraint upon the power to pass special or local laws in any case to which its prohibitions do not apply. But for the exceptions made in this section as to *municipal* officers and like *courts*, of course no special or local law could be passed regulating the jurisdiction and duties of the former or the practice of the latter.

Section 21, down to the proviso, is a mere declaration of the original and inherent legislative power as to special or local legislation on all subjects or in all cases to which the restraint of section 20 is not applicable. The proviso was intended as a limitation upon the original or inherent power standing or left unaffected by section 20. Being in the shape of a proviso, this limitation is to be construed strictly. A proviso to a statute is to be so construed as to take no case out of the enacting clause, which is not fairly within the terms of the proviso; its office is to except something from the enacting clause, or to restrain its generality. Mim's vs. U. S., 15 Peters, 423 ; Wyman vs. Southard, 10 Wheaton, 1 ; 1 Wash. C. C. R., 119. No case to which section 20 does not apply is to be taken by the proviso to section 21 out of the original and inherent legislative power so positively affirmed by the first part of section 21, unless such case is fairly within the terms of the *proviso*. It requires but slight consideration to perceive that there are many cases of special legislation that are not local, and we confess an inability to discover that the proviso applies to any special legislation that is not also local.

It is only where the matter or thing to be affected is sit-
uated in some locality, that the proviso is operative.

Section 24 of the same article provides that " the Legis-
lature shall provide a uniform system of county and mu-
nicipal government, which shall be applicable, except in
cases where local or special laws are provided by the Legis-
lature that may be inconsistent therewith." If this and
the preceding sections were all there is to be found in our
Constitution upon the subject of special or local laws and
municipalities, it would be clear that the purpose and in-
tention of the framers of that instrument were that the
proviso to section 21 would control special legislation in-
corporating a city or town, or excepting an existing mu-
nicipality from the general and uniform system of laws
governing the class of municipalities to which it might be-
long.

In the eighth article of the instrument entitled " Cities
and Towns," is to be found the following as constituting
its eighth section : " The Legislature shall have power to
establish and to abolish municipalities, to provide for their
government, to prescribe their jurisdiction and powers, and
to alter or amend the same at any time. When any mu-
nicipality shall be abolished, provision shall be made for its
creditors."

It is contended that section 24 of the legislative article,
set forth above, classifies special municipal charters for par-
ticular cities or towns as local or special laws within the
meaning of the Constitution. It can hardly be denied that
they are special and local laws both in fact as well as in
contradistinction to the uniform system of municipal gov-
ernment contemplated by the 24th section just mentioned.
The admission, however, that a statute incorporating a
particular municipality and providing for its government,
prescribing its jurisdiction and powers and regulating the

jurisdiction and duties of its officers and the practice of its courts, is both a special and a local law, is not conclusive of the question whether or not, in view of section 8 of article 8, it is such a local law as the proviso of section 21 of article 3 applies to. This proviso is general in so far as it is applicable; and it applies to matters or things having a local status, as indicated above, and covers special legislation in the cases of cities and towns, unless they are excepted from it by some other part of the Constitution. The effect of the proviso construed simply in connection with sections 20 and 24 and the preceding part of section 21, is that the Legislature cannot by special law establish a particular municipality and provide for its government and prescribe its jurisdiction and powers, and alter or amend the same, *at any time*, but only at a session prior to which sixty days' notice may have been given that application for such special legislation will be made. Under the doctrine fully established in this court that cities and towns may be classified, and, as has been held by us and by several courts, 21 Fla., 280, and cases cited ; 47 N. J. (Law), 368 ; 16 Neb., 74, that a law general in its terms and applicable to whatever municipality may at any time come within its provisions, is not made special or obnoxious to a requirement of a general and uniform system of municipal government by the fact that there is at the time of its enactment but one municipality within its provisions, it is clear that in so far as general or uniform legislation is concerned, there was no necessity for section 8 of article 8. It was of course not needed to confer power upon the Legislature to make general or uniform legislation, for this was commanded by section 24 of article 3 ; and as no part of section 21 puts any restraint upon such general and uniform legislation, or, in other words, as no part of it requires any notice of when such legislation is to be applied

for or done, there was nothing in section 21 which in any wise made section 8 of article 8 necessary with reference to legislation for the establishment of a uniform system of municipal government, and if we construe it with reference to such legislation, we find that it is practically of no effect, and serves no useful purpose whatever.

Turning our attention to section 8 of article 8, what do we find it to be? It is an express and unqualified declaration of the power of the Legislature to deal with municipalities "at any time," according as and whenever the public good might require the establishment or abolishment, the alteration or amendment, of any municipal government. The provision that "when any municipality shall be abolished, provision shall be made for its creditors," clearly shows that the idea in the mind of the convention in framing this section was that the Legislature might abolish a particular municipality, and that its purpose in this particular sentence was to require the Legislature in such case to make provision for the protection of the municipality's creditors. This section provides in effect for special legislation at any time upon the subject of municipalities. There is nothing in section 24, of article 3, hostile to it. The former authorizes the " local or special laws " contemplated by the other, and provides that they may be enacted at any time. The only provision in the Constitution which is opposed to it is the proviso to section 21, of article 3, and hence the question presented for solution is that in one portion of the Constitution prescribing regulations as to legislation, it is provided that there shall be no special legislation of a local character upon any subject on which local legislation is permitted, at any session, except one of which a prescribed notice of intention to apply for such legislation has been given ; while, in another portion of the Constitution, the language is such as to show clearly that legisla-

tion relating to municipalities, and consequently local in its nature, should not be restrained or hampered by the regulation as to notice prescribed for all other cases of special local legislation.  Such being the fact, it is plain that the intention of the framers of the Constitution in putting section 8, of article 8, in the Constitution, was to qualify the general effect of section 21, of article 3, or, in other words, to exempt special legislation as to cities and towns from its effect.  The result of any other construction is to render the former section of no effect whatever as a part of the Constitution.

The third section of article 8 declares that the Legislature shall have power to establish new counties and to change county lines.  The former power did not exist under the old Constitution.  14 Fla. Reports, 320.  This was an anomaly.  By the fourth section of the same article it is provided that the Legislature cannot remove county seats but shall provide for their removal by general law, except that in the formation of new counties the seat may be temporarily established by law.  Though in section 20 of article 3 all local legislation under section 21 or otherwise as to several subjects of county concern are specially interdicted, the purpose of sections 3 and 5 of article 8, which also fixes the liability of a newly established county for its proportion of the existing liabilities of the county or counties from which it may be formed, was we think to give the Legislature power at its pleasure to establish new counties and to temporarily locate the county site at the same time.  If the proviso of section 21, of article 3, applies to cities and towns it must to counties; to make a new county of a part or parts of an existing county or counties is no less local legislation than to make a city or town of the same.  As between counties on the one hand and municipalities on the other, there is to be noticed, however, not

only the express provision as to time in section 8, but also the fact that the declaration of power extends not only to the establishment of municipalities but to providing for their government, prescribing their jurisdiction and powers, and to altering and amending the same, thus indicating a more extensive exception of municipal, than of county legislation, from the trammels of such proviso. A like discrimination is shown by section 20 of article 3, which, as appears at the outset of this opinion, absolutely prohibits any special legislation as to several matters of county government, without extending the same prohibition in the case of municipalities. When we consider the part which county officials perform in administering the general laws of the State, this discrimination appears entirely reasonable.

In construing a constitution the whole of it is to be examined with a view to arriving at the true intention of each part effect is to be given, if possible, to the whole instrument, and to every section and clause. If different portions seem to conflict, the duty of the courts is to harmonize them if possible, and to lean in favor of a construction which will render every word operative rather than one which may make some words idle and nugatory. One part may qualify another so as to restrict its operation or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together. Cooley C. L., 70, 71. The view we take is the only one which gives any effect or operation to section 8. This view makes it qualify the operation of the proviso to section 21, whereas any other construction would make section 8 entirely nugatory.

Legislation as to municipalities may be enacted at any time. " It is the duty of the court to give effect, if possi-

ble, to every clause and word of a statute, avoiding if it may be any construction which implies that the Legislature was ignorant of the meaning of the language it employed." Montclair vs. Ramsdell, 107 U. S., 152. The same is true of Constitutions and Conventions which frame them.

The conclusion we have reached is one that flows from the consideration of the several sections of the Constitution, but it is nevertheless true that no fact was more prominent in the history of the times during which the question of calling the convention that framed this Constitution was agitated than the inconvenience which the people of many municipalities had suffered from the restraint placed by the Constitution of 1868, of which it is a revison, upon special legislation as to cities and towns, and the action of the convention in excepting them from the requirements of the proviso discussed, was a natural response to the sentiment which had prevailed in favor of an untrammelled power of legislation as to municipalities.

II. We will now consider the question of the right of the Lieutenant-Governor to preside over the Senate.

The facts are that Milton H. Mabry, who was elected in November, 1884, to the office of Lieutenant-Governor, for the term of four years to commence in January, 1885, presided over the Senate of 1887, and the statutes in question are signed by him as " President of the Senate." The Constitution in force at the time of his election and of which the present one is a revision provided as follows : " A Lieutenant-Governor shall be elected at the same time and places and in the same manner as the Governor, whose term of office and eligibility shall also be the same. He shall be the President of the Senate but shall have only a casting vote therein. In the case of the impeachment of the Governor or his removal from office, death, inability to discharge his official duties, or resignation, the power and

duties of the office shall devolve upon the Lieutenant-Governor for the residue of his term or until the disability shall cease." * * * Sec. 14 of Art. 5, of Const. of 1868, as amended in 1875.

The provisions of the Constitution framed in 1885 and ratified by the people bearing upon the question before us are as follows :

Section 2 of the Legislative Article (III) provides that " regular sessions of the Legislature shall be held biennially, commencing on the first Tuesday after the first Monday in April, 1887, and on the corresponding day of every second year thereafter," and for special sessions, and prescribes the maximum length of regular and special sessions. section 6 of the same article ordains that " the Senate shall at the convening of each regular session thereof, choose from among its own members a permanent President of the Senate, who shall be its presiding officer."

In case of the impeachment of the Governor, his removal from office, death, resignation or inability to discharge his official duties, such powers and duties of the Governor devolve under section 19 of article 4, (" Executive Department ") upon the President of the Senate for the residue of the term or until the disability shall cease. By section 1 of article 7, entitled Census and Apportionment, the Senators representing the odd numbered districts, as said districts are now designated, whose terms of office have not expired, and those Senators representing even numbered districts to be elected A. D. 1886 *under the Constitution of 1868* shall be the first Senate under this Constitution, and the *members of the Assembly* to be elected A. D. 1886 shall be the first *House of Representatives* under this Constitution, and the Senate and House of Representatives thus constituted shall be the First Legislature under this Constitution ;" and the terms of all such Senators and members of the House of

Representatives are to expire at the election in 1888, when "a new Senate and House of Representatives shall be elected."

The following are sections of article 18, the "schedule :"

" SECTION 3. All persons holding any office or appointment at the ratification of this Constitution shall continue in exercise of the duties thereof, according to their respective commissions or appointments, and until their successors are duly qualified, unless by this Constitution otherwise provided.

" SEC. 4. Nothing contained in this Constitution shall operate to vacate the office of Lieutenant-Governor until the expiration of his present term.

" SEC. 9. A general election shall be held in each county in this State on the first Tuesday after the first Monday in November, 1888, and every two years thereafter, for all elective State and county officers whose terms ot office are about to expire or for any office that shall have become vacant.

" SEC. 10. The first election for County Judge, Clerk of the Circuit Court, Sheriff, Tax Assessor, Tax Collector, County Treasurer, County Superintendent of Public Instruction, County Surveyor, Justices of the Peace, Constables and all other elective county officers shall be at the general election in 1888."

The time for the Constitution of 1885 to go into effect, as fixed by Ordinance No. 1, was January 1, 1887, and though it is true that by section 1 of the " Schedule " the Constitution adopted in 1868, with the amendments thereto, is declared to be " superseded by this Constitution," there is nothing more distinct than a general intent to keep in force after January 1, 1887, certain provisions of the old instrument, and retain in office the functionaries holding at the time of the ratification of the new instrument in 1886.

The purpose and effect of section 3 of the schedule is, that in all cases where it is not otherwise provided, any person holding office at the time of the ratification of the new instrument, should continue in the exercise of the duties of his office according to his commission, not only for the period named in the commission, but also until his successor should actually qualify. In addition to the general provision of this section, there are in the Constitution special evidences of such purpose upon the part of the framers of the instrument. The Senators from the odd districts were retained and those from the even districts, to be elected in 1886, were, as were the members of the Assembly, made elective under the old Constitution. In the case of the Governor, it is expressly provided by section 2 of the Executive Article, that no election shall take place under this Constitution until the election of the Legislature in 1888, and the term of the Governor then to be elected is not to begin until the first Tuesday after the first Monday in January, A. D. 1889. Of the office of Adjutant-General, in whose duties a radical change is made, it is ordained by section 16 of the same article " that this Constitution shall work no vacancy in the office of Adjutant-General *as now constituted*, until the expiration of the present term." Another of the administrative officers holding under the Constitution of 1868 was the Commissioner of Lands and Immigration. The new Constitution does not continue this office as one of the permanent administrative officers of the government, but provides in section 26 of the same article for a Commissioner of Agriculture, " who shall perform such duties in relation to agriculture as may be prescribed by law; shall have supervision of all matters pertaining to public lands under regulations prescribed by law, and shall keep the Bureau of Immigration," and " have also supervision of the State prison, and shall perform such other

duties as may be prescribed by law;" yet by section 8 of the schedule it is declared that " upon the ratification of this Constitution the Commissioner of Lands and Immigration shall assume the office of Commissioner of Agriculture, and his duties as such shall be prescribed by the first Legislature assembled under this Constitution."

In these special provisions we have clear evidence of the fixed purpose of the framers of the Constitution to continue not only officers but in some cases both offices and officers as they existed under the old instrument; and the fifth section of the schedule makes it still clearer that this was not done either by them or by section 3 of the schedule merely to give to persons then in office the privilege of continuing their tenure till their commission might expire, or they resign or die. It provides that " all vacancies occurring by limitation of terms before the general election of 1888, shall be filled, as provided by law, under the Constitution of 1868." This means that if, at any time prior to the election of 1888, the term of an officer continued by section 3 should expire by limitation, the vacancy in such office should be filled as provided for by law under the Constitution of 1868. Of course, until such vacancy was filled, and the appointee thereto " qualified," the person whose term had so expired by limitation would continue to hold. It was well known to the framers of the Constitution that numerous vacancies of this kind would occur in county offices existing at the ratification of the instrument. By section 10 of the schedule, set forth above, the new elective county officers are not to be elected till next fall.

There were, however, officers holding under the old Constitution at the formation, as well as the ratification, of the new Constitution, whom the framers of the latter did not

intend should continue in the exercise of the duties thereof according to their commissions.

Under the former Constitution, Justices of the Supreme Court held for life, or during good behavior, and Judges of the Circuit Court held for eight years from the date of their commission after being confirmed by the Senate. The new Constitution has, by section 2, of article 5, made the term of the Justices of the Supreme Court one of a certain number of years, and provided for the election of such justices by the people in 1888, and that the term of office of those then elected shall begin on the first Tuesday after the first Monday in January, 1889. By section 8, of the same article, Circuit Judges are to hold their offices for six years, and it provides that "successors to the Judges of the Circuit Courts in office at the ratification of this Constitution, shall be appointed and confirmed at the first session of the Legislature after such ratification." It is a fact that of the seven Circuit Judges in office at the time of such ratification, there were four whose terms of office, "according to their commissions," would not have expired until some time in one of the several years of 1889, 1891, or 1893. It is plain that these two classes of judicial officers are those to whom the language, "unless otherwise provided," of section 3, of the schedule, applies. The appointment of Circuit Judges was made last spring, at the first session of the Legislature under the new Constitution.

The question which now presents itself is, what disposition the new Constitution has made of the office of Lieutenant-Governor, as it existed under section 14, of article 5, of the Constitution of 1868, set out above, and of the incumbent of the office at the time of the ratification of the former instrument.

It seems clear that, if considered independently of section

33

4 of the schedule, the meaning of the new instrument was that the office and its occupant should continue undisturbed until there should be an election by the Senate, upon its convening in the spring of 1887, of one of its members as president of the body, and that, upon such election and the qualification of such president of the member so elected, the office of Lieutenant-Governor should cease, and with it the duties of the Lieutenant-Governor terminate; but on the other hand, that until such election and qualification, he and theo ffices-hould exist, and the Lieutenant-Governor continue in the performance of his duties. There is no ground for holding that the office or any of its duties terminated on the assembling of the Senate, or at any time prior to the qualification of the new officer. It is a fact that the Senate of 1887 did not " choose from its own members a president of the Senate," though on April 14 it did elect one of them president *pro tem.* Nothing could be further from fact than to impute to the Senate any intention ·that such president *pro tem.* was to be the permanent " presiding officer," or "president of the Senate," contemplated by the new Constitution. Lieutenant-Governor Mabry had presided and acted as president of the Senate in accordance with the old Constitution and continued to preside over it during the residue of the session.

If section 4 of the schedule was not in the new Constitution we do not say it would not have been the duty of the Senate to choose a presiding officer under section 6 of article 3 before proceeding to the enactment of laws. Without holding that laws enacted under the presidency of the Lieutenant-Governor before an election of a President would have been invalid, we are inclined to the opinion that it would have been the duty of the Senate to choose such an officer before proceeding to legislate.

It must have been clear to the minds of the members of the convention that the office of Lieutenant-Governor would, without section 4 of the schedule, terminate upon such choice of a member and his qualification as President. What, then, is the meaning of the provision that " nothing contained in this Constitution shall operate to vacate the office of Lieutenant-Governor until the expiration of his present term ?" If it had been intended simply to permit Mr. Mabry, out of personal considerations, to hold during the remainder of his term, or for such part thereof as might suit his pleasure, the provision would have been so worded as merely to secure to him this privilege, but instead of this we see that the *office* is continued for the remainder of the term. Nothing in this Constitution vacates the office of the Lieutenant-Governor during the present *term* of such officer as fixed by the old Constitution. The use of the pronoun " his " is to refer to the officer, whoever he may be ; it means the present term of the office of Lieutenant-Governor, and not simply Mr. Mabry's individual holding. It is a common form of expression in the Constitution ; *e. g.*, " the Governor * * shall hold his office for four years." Section 2, Article 4. " The Adjutant-General, etc ; * * his duties shall be prescribed by law." Section 16.

The construction that it was intended only as a personal indulgence to Mr. Mabry, would, had he resigned or died prior to an election of a President of the Senate, create a hiatus in the government in case of a like vacancy in the office of Governor before such election.

The only thing in the Constitution which could have the effect to vacate the office of Lieutenant-Governor are the provisions of section 6 of Article 3 as to a President of the Senate, and the functions of such officer, as prescribed by this section and by section 19 of the Executive Department,

providing for a successor to the office of Governor in case of the death or resignation of the Governor or other vacancy in such office. The juncture of these things would, upon an election of a member of the Senate as President and his qualification as such, if unrestrained, vacate the office by giving to the new President of the Senate all the powers, duties and functions which, under the old Constitution, the Lieutenant-Governor had. Where all the powers and duties of one office are, by a Constitution, placed upon another, and no provision is made to continue the former, it must be held that the former office ceases. If, then, the office of Lieutenant-Governor would have been thus vacated, without section 4 of the schedule, was it not the purpose of such section to avoid the effect of sections 6 and 19 of Article 3, and not only to avoid the effect, but to do so by suspending their operation during the present term of the office of Lieutenant-Governor? It is argued that the former was the purpose, but not the latter. This argument imputes to the Legislature the intention to continue an office without functions, and an officer without duties, as a burden upon the public—the appropriation of public funds to a private individual who is without the possibility of return of services as an officer. Such a purpose can never be imputed to a convention or other representative body in the absence of its declaration set forth in the clearest and most positive terms. No convention would thus appropriate the public funds, except as a reward for past services of such a character as to command the gratitude of the people; nor without indicating the service for which, in response to public sentiment, they had extended the reward. Not only is the idea of such a continuation of an office without function unreasonable, but it is opposed to the general intent shown throughout the Constitution as indicated above.

Narrow and technical reasoning, says Mr. Cooley, is misplaced, when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government. Though more accurate language might have been used to express their meaning, still, in our judgment, the purpose and effect of section 4 was to continue the office of Lieutenant-Governor for at least the remainder of the term as it existed under the old Constitution, as was done in cases pointed out above. Should Mr. Mabry resign or die, or a vacancy in the office of Lieutenant-Governor occur, the office would still continue, and it would be the duty of the Governor to fill the vacancy, under section 7, of Article 4, which provides that " when any office, from any cause, shall become vacant, and no mode is provided by this Constitution or by the laws of the State for filling such vacancy, the Governor shall have the power to fill such vacancy by granting a commission for the unexpired term." See Weeks vs. Gamble, 13 Fla., 9.

By section 1 of Article 7, *supra*, the term of all Senators expires on the first Tuesday after the first Monday in November, A. D. 1888, and hence if the construction opposed by us is correct and a vacancy should occur in the office of Governor between that time and the first Tuesday after the first Monday in January, 1889, a hiatus would occur in the government. Whether or not, under sections 3 and 4 of the Schedule, the Lieutenant-Governor holds over till the election of a President of the Senate in 1889, we need not decide.

There is nothing inconsistent with our conclusion in the cases cited by counsel, who argue that the Lieutenant-Governor was not authorized to preside over the Senate. In Sigur vs. Crenshaw, 8 La. Ann., 401, the question was,

whether the old officers would hold until the expiration of their respective terms, or merely until the appointment of their successors.

The defendant claimed the right to hold to the end of his term, as against the plaintiff, an appointee under a new Constitution. " The construction claimed by the plaintiff is strengthened," says the opinion of the court, "by a reference to constitutions of our sister States, which he has cited. Some of them exhibit express reservations in favor of antecedent officers, continuing them in office during their unexpired terms, or until some stated day * * *. In our Constitution no such express reservation is found. The officers, executive, judicial and military, are to perform their duties until the organization of the government under this Constitution, and the entering into office of the new officers to be appointed under said government. and *no longer.* The last words seem to have been used out of abundant diligence and caution, to exclude implication, and shut out just such a discussion as is raised by the defend ant." •

Here was shown a clear general intent that officers should continue in the performance of their duties according to existing laws, " though the same be contrary to this Constitution," until the appointment of the new, and no longer, although the terms for which the former were appointed had not expired, whereas in our Constitution, as in those of " sister States," referred to in the above quotation, the *general* plan and intent was otherwise.

In State vs. Richardson, 17 Mo., 515, the facts were, that a section of the Constitution provided for a Secretary of State, to be appointed by the Governor and confirmed by the Senate, and prescribed his term and duties. An amendment was adopted which expressly abolished this section, and provided for a Secretary of State, who should

be elected by the people, and fixed his term and duties. Although the amendment made no provision as to the original or appointed Secretary of State holding until the election and qualification of his successor, it was held that a statute passed subsequently providing that the former officer should hold until such election and qualification was valid and that the amendment did not vacate the former office of Secretary of State. The decision in State vs. McAdoo, 36 Mo., 452, is to the effect that an *ordinance* passed by the convention, March 17, 1865, and vacating certain offices and authorizing the Governor to fill the vacancies by appointment for the remainder of the term, did not authorize an appointment by the Governor after July 4, 1865 (at which time the Constitution went into effect), to fill a vacancy occasioned May 17th by the death of the first appointee; that the new Constitution was from the time it went into effect, the supreme law of the land, and applied to all subjects of this nature not specially exempted from its operation; that this was not one of them, but must be filled in another manner provided by certain parts of the *Constitution* covering the case. In view of section 5 of the schedule to our new Constitution, viz : "all vacancies occurring by limitation of terms before the general election in 1868, shall be filled as provided by law under the Constitution of 1868," is it not plain that many old officers were to continue after the expiration of the terms of the incumbents holding at the ratification of the new? It is well known that they were appointive officers, and that the vacancies are to be filled by executive appointment. It is sufficient to say of the other authorities, that we have seen none whose doctrine, when considered with reference to its facts, is in conflict with the views and conclusions held by us in this opinion.

The Lieutenant-Governor was rightfully the president of the Senate of 1887.

III. The next question to be considered is the sufficiency of the titles of statutes in question under section 16, of article 3, of the Constitution. This section reads as follows: " Each law enacted in the Legislature shall embrace but one subject and matter properly connected therewith, which subject shall be briefly expressed in the title ; and no law shall be amended or revised by reference to its title only ; but in such case the act as revised or the section as amended shall be re-enacted and published at length."

The title of the original of the two statutes is " An Act to establish the municipality of Jacksonville, provide for its government and prescribe its jurisdiction and powers." The first section of the statute enacts " that a municipality, to be called the City of Jacksonville, is hereby established in Duval county, the territorial limits of which shall be as follows," and then sets forth such limits. Section 1 of the 14th article of the act provides that " the charters of the City of Jacksonville, LaVilla and Fairfield, in Duval county, under which said cities have heretofore been incorporated, are hereby abolished." It is admitted in argument that the territory included within the lines described in the first section, covers all the territory of the original city of Jacksonville and of Springfield, and nearly all of LaVilla, and also additional territory. The suggestion, if not the contention, is, that the title is insufficient in that it does not express the matter of the repeal of these charters. The purpose of the act is to establish a municipality to be called the City of Jacksonville. This is the subject of the act mentioned ; it is a single municipality. When the real subject is given in such a manner as is sufficient to put the attention of the legislators upon the mat

ter to which the body of the act is to relate, the require-ments of the Constitution as to what shall be " briefly ex-pressed in the title," is answered. This requirement does not call for any statement in the title of "the matter prop-erly connected " with the subject. The repeal of munici-pal charters covering different portions of a piece of terri-tory which a new original act proposes to constitute as one municipality is, in our opinion, in so far as the territory covered by the new charter is concerned, clearly matter connected with the subject of the act. It is as much so as any provision of the act relating to the government of the new city. Titles cannot do more than state the real sub-ject. When they do this, and are so framed as to indicate that certain matters naturally connected with the subject are not to be included in the bill, they are not misleading as to anything connected with the subject of the act, yet we do not say that a title so framed as to indicate that certain matters connected with the subject were to be excluded from the bill, would not be insufficient as to such matters should the bill treat of them. State, _ex rel._, vs. Palmes, (decided at present term), and Alleghany County Home's case, 77 Penn. St., 77.

The title to the amendatory act approved June 2, of the present year, is also assailed. It is as follows: " An act to amend an act entitled ' An act to establish the munici-pality of Jacksonville, provide for its government and pre-scribe its jurisdiction and powers,' approved May 31, 1887." This amendatory act has after the usual enacting clause two sections. The first of these sections reads as follows: " Section 1. That section 3 of Article 4 be amended so as to read as follows—then setting forth its provisions, which it is not necessary to state, and the second section (except-ing its own number) is according to the _enrolled_ bill in the same language, except of course, the substantive provisions.

It is urged upon us that as the title indicates an amendment to the *act* and not merely of a section or sections of it, and on the other hand the body of the bill, in so far as its first and second sections are concerned, purports to amend only a *section* or *sections;* that the above section of the Constitution, in so far as it applies to the amendment of the statutes, is not complied with.

The amendatory statute, being an express amendment, is within the constitutional provision. The language of this provision, " and no law shall be amended or revised by reference to its title only, but in such case the act as revised, or section as amended, shall be re-enacted and published at length," annuls all express amendments made by mere reference to the title of the amended act, and requires that the act as revised, or the section as amended, shall be re-enacted and published at length. It is not necessary to set out the act proposed to be revised, or the section proposed to be amended, or the section proposed to be amended, in their original words. Cooley C. L., 183. The title to bills expressly amendatory do not have to indicate the nature of the changes proposed in the body of the bills. There is nothing in this constitutional provision as to amendments, as we see it, that requires the title of an amendatory statute to specify the particular section or sections of a statute proposed to be amended. Whether or not the title of the amendatory act expresses sufficiently the subject of the act is a question under the previous clause of the section of the Constitution. If it proposes to introduce matter properly connected with such subject, the title of the original act (if it has sufficiently expressed such subject) is all that is required in this particular as a title to the amendatory act. The statement in the title of an amendatory act of the mere number of the particular section to be amended, though it may be of some convenience, does not in itself inform the

legislators of the contents of the section which is to be replaced by the amendatory provisions, any more than the statement of such number in the body of the amendatory act does.

The provisions as to publishing at length the act as revised, or the section as amended, do not relate to the matter of the title of a statute, but they are commands regulating the form in which the body of the amendatory act is to be put, and their effect is that when the new act is meant as a revision of the entire original act, or as an amendment of a section or sections, that the new act or section as it is to be, shall be set forth at length so that the one or the other may be seen and understood in its entirety by the Legislature. The effect and purpose of these provisions and of the prohibition against amendment by simple reference to the title are to do away with the old system of amending by inserting certain words in certain lines, or certain sentences in certain sections, without the Legislature having the text before them in its changed form so as to understand what was intended. An act which amends only one section of another act is yet an act amending the latter act. We are unable to see any infraction of the constitutional provisions in question or any evil result to flow from the form of the title before us.

The fact that there are in the amendatory act two sections purporting (according to the enrolled act) to amend one section (3 of article 4) is to our minds of no moment. The Legislature has substituted subject matter contained in two new sections for the subject matter of one section. Though informal it is as effective as if it had been in one instead of two sections. This is made plain by treating as surplusage, as we well may, the words " that section 3 of article 4 be amended so as to read as follows," in section 2 of the amendatory act. What the legal effect of the sub-

ject matter of either may be upon that of another existing section is not before us.

IV. In the enactment of sections 1 and 2 of the amendatory act the following provisions of the section amended have been omitted, viz : " The said commissioners " [appointed to divide the city into wards] " shall, by the concurrence of a majority of their number, make the said division, and certify the same under their hands to the County Commissioners of Duval county within ninety days after the passage of this act, after which the County Commissioners of said county shall provide for the registration of voters in said wards, and shall appoint the judges or inspectors and clerks of election, and receive the returns and declare the result of the election, and furnish certificates to those elected." Being so omitted they cease to be a part of either of the statutes. Basnett vs. City of Jacksonville, 19 Fla., 664.

There is in the statute no other provision imposing similar duties as to this municipality on the County Commissioners, the defendants here, and, as a consequence, they cannot be compelled to perform the duties in question, and the motion to quash must, on this ground alone, be granted, and it will be so ordered.